UNITED STATES, Appellee,

v.

Staff Sergeant Guillermo A. QUIN-
TANILLA, United States
Army, Appellant.

ARMY 9601468.

U.S. Army Court of Criminal Appeals.

17 April 2000.

For Appellant: Captain Stephanie L. Haines, JA (argued); Colonel John T. Phelps II, JA; Colonel Adele H. Odegard, JA; Major Holly S.G. Coffey, JA; Captain Jodi E. Terwilliger–Stacey, JA (on brief); Craig W. Carlson, Esquire (on supplemental brief); Captain Donald P. Chisholm, JA.

For Appellee: Captain Kelly D. Haywood, JA (argued); Lieutenant Colonel Eugene R. Milhizer, JA; Major Patricia A. Ham, JA (on brief).

Before CARTER, VOWELL, and NOVAK, Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:

The appellant was charged with a variety of sexual offenses involving five young men. A general court-martial composed of officer and enlisted members convicted him, contrary to his pleas, of forcible sodomy of RW (a child under the age of sixteen), indecent assault upon CJ, and indecent acts upon Private (PVT) B, in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925 and 934 [hereinafter UCMJ].[1] He was acquitted of a separate specification

---

1. The indecent acts conviction was of the lesser included offense of a charged indecent assault. The indecent assault conviction was a finding by exceptions and substitutions.

of forcible sodomy of JB and of two other specifications of indecent assault upon CJ and CS. The convening authority approved the adjudged sentence of reduction to Private E1, forfeiture of $300.00 pay per month for thirty-six months, confinement for three years, and a bad-conduct discharge.

In his Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant argues that an out-of-court confrontation between the military judge and a government witness, Mr. Bernstein, turned the appellant's trial into a "circus," and mandated the military judge's disqualification under Rule for Courts–Martial [hereinafter R.C.M.] 902.[2] The appellant asks that we set aside his conviction and dismiss all of the charges and specifications.

We find no errors prejudicial to the appellant, but the allegations of judicial disqualification and instructional error warrant discussion.

## BACKGROUND OF THE OFFENSES

### I. Charges Involving Civilian Victims

The appellant, a forty-two year old divorced soldier, lived with his teen-age son in Killeen, Texas. The appellant also had a number of soldiers, civilians, and family members of soldiers residing in his home at various times during the 1993–95 time frame, the period of the charged offenses.

JB, then a high school senior, came to reside with the appellant in March or April 1995, when his family moved too far away for him to commute to school. He paid the appellant $50.00 a month for room and board. JB had previously lived with his stepfather, Master Sergeant (MSG) W, his mother, and his half-brother, RW, in military housing on Fort Hood.

JB moved out of the appellant's home in August 1995, and in with Mr. Bernstein, who was first his employer and later his partner at Pizza Time, part of a chain of pizza par-

lors. Concurrently, JB confided in Mr. Bernstein that, while he was living with the appellant, the appellant had forcibly performed fellatio on him in the appellant's car in a park at Fort Hood.[3]

Another young military family member, CS, was also employed at Pizza Time. He mentioned in the course of his employment interview with JB that he had seen JB at school and at the appellant's house. Mr. Bernstein, who was observing the interview, became suspicious that the appellant had also sexually molested CS. Mr. Bernstein questioned CS about the appellant, and CS admitted that the appellant had indecently assaulted him after getting him drunk.[4]

Mr. Bernstein was aware that JB's half-brother, RW, had spent some time with the appellant. Suspicious that the appellant may have molested RW as well, Mr. Bernstein contacted MSG W, and suggested that he talk with his son about the appellant. When MSG W did so, RW admitted that the appellant had sexually molested him on one occasion when he had stayed overnight at the appellant's home. RW was under the age of sixteen at the time. Mr. Bernstein never spoke directly with RW about the appellant.

Mr. Bernstein's involvement in the initial disclosure and subsequent investigation of the offenses involving JB, CS, and RW became one of the defense's principal avenues of attack on the prosecution's case. His flamboyant personality, his motivation for involvement, and the level of his influence on these witnesses became a major focus of the trial. Two confrontations between Mr. Bernstein and the military judge, Colonel Hodges, during trial recesses are the basis for the assignments of error discussed, *infra.*

### II. Charges Involving Military Victims

The other two individuals who testified that the appellant had sexual contact with them were PVT B and a former soldier, CJ. Neither had any contact with Mr. Bernstein,

---

2. The appellant also assigned as errors the legal and factual sufficiency of his conviction of forcible sodomy, arguing that the evidence failed to establish the act was committed by force and without the consent of the victim; the qualification of an expert witness; and the government's failure to disclose exculpatory evidence.

3. The appellant was acquitted of this offense.

4. The appellant was also acquitted of indecently assaulting CS.

and each reported the appellant's sexual contact independently of the other.

Private B was new to the appellant's battalion, arriving at a time when most of the unit was deployed. He met the appellant at the unit area, and, at the appellant's invitation, went with him to play pool. Later, PVT B and the appellant stopped off at the appellant's house, and the appellant invited him to spend the night. Shortly after retiring for the evening, the appellant laid down on the floor near where PVT B was lying, and touched PVT B's genitals. Private B got up, left the house, and found a ride with another of the appellant's roommates back to Fort Hood, where he reported the incident to the Staff Duty Noncommissioned Officer at his unit.

CJ testified to two separate sexual assaults by the appellant, one that occurred in CJ's barracks room and one that occurred several months later at a party at the appellant's home. The offense in the appellant's home, of which the appellant was convicted, was very similar to that involving PVT B: CJ was sleeping on the floor in a bedroom—the result of his consumption of a large quantity of beer—and awoke to find the appellant groping his genital area.

### III. Other Events at Trial

The appellant was arraigned on 7 May 1996. The civilian defense counsel, Mr. Carlson, requested a continuance until 17 July 1996 to complete his pretrial preparations, and to accommodate his trial schedule and that of the trial defense counsel. Although he expressed some concern at the lengthy delay, the military judge granted the request.

While not reflected in the record of trial, another continuance was apparently granted, as the next Article 39(a), UCMJ, session was not held until 10 August 1996, a Saturday. Voir dire of the court members subsequently began on 19 August 1996 and was completed that afternoon. The court was then recessed, with plans to begin opening statements on the following morning.

Rather than commencing with opening statements on 20 August 1996 as planned, an Article 39(a), UCMJ, session was called to litigate additional evidentiary issues. The court members finally entered the courtroom at 1055 hours, 20 August 1996. Opening statements were followed by a lunch recess for the court members and another Article 39(a), UCMJ, session for the judge and counsel.

During this session, the military judge obliquely referenced the morning's trial delay, as he cautioned Captain (CPT) Schwind, the trial counsel, to have his witnesses in order to minimize delays between witnesses. The Article 39(a), UCMJ, session terminated with a recess to ensure the witnesses were present.

Trial on the merits did not begin until 1250 hours, when the first witness, CS, was called. Immediately upon his entry into the courtroom, Mr. Carlson requested a sidebar wherein he asked for a short recess to interview the witness. After ascertaining that the witness had testified at the Article 32, UCMJ, hearing, the military judge noted, "[W]itnesses in cases like this do tend to be a little reluctant, a little frail, and we have had them waiting all morning." Mr. Carlson withdrew the request to interview the witness, and CS then testified.

At the conclusion of CS's testimony, the government called JB as its next witness. When JB failed to report to the courtroom in a timely manner, the military judge left the courtroom to ascertain the reasons for the delay. Shortly thereafter, two confrontations ensued between the military judge and Mr. Bernstein. These confrontations and the events that followed them form the basis for the appellant's request that we set aside his conviction and dismiss the charges.

### IV. Findings of Fact

In determining whether the military judge was disqualified under R.C.M. 902, we have analyzed both what transpired during the two confrontations and what was actually disclosed to the parties at the trial. We draw this distinction because, while the military judge's initial, on-the-record disclosures were accurate, they did not always contain all the information we find relevant to the matters before us. In making our findings of fact, utilizing our Article 66(c), UCMJ, au-

thority, we have thus relied primarily on the serial disclosures of what occurred contained in the record of trial, although some of the factual findings necessary to resolve whether the military judge was required to disqualify himself were provided by the uncontested facts contained in Defense Appellate Exhibits A–I.[5] *Cf. United States v. Ginn,* 47 M.J. 236, 240 (1997).

We find:

1. The trial counsel called JB, a government witness, to the stand, and a bailiff departed the courtroom to retrieve him. The bailiff returned without JB and conferred briefly with the trial counsel. Correctly assessing the situation as involving a reluctant witness, the military judge directed the bailiff to tell JB the judge was ordering him into the courtroom.

2. Specialist (SPC) Cooks, a legal specialist serving as a bailiff, and CPT Henry, the Chief of Military Justice for the 1st Cavalry Division, who had been seated in the spectator section, both left the courtroom.

3. After a period of delay not specified in the record, JB failed to appear in the courtroom. The military judge told the court members that he had a "premonition" and directed them to go into the deliberation room. At the request of the trial counsel, the military judge rescinded his direction that the court members depart, and permitted the trial counsel, CPT Schwind, to leave the courtroom to get JB.

4. After another undetermined period of delay, the military judge recessed the court-martial at 1428 hours on 20 August 1996. The court members returned to the deliberation room.

5. The military judge was frustrated at the delays that had pushed commencement of the trial on the merits to the afternoon of 20 August 1996. For this reason, when JB did not promptly appear when called as a witness and two government attorneys were unable to produce him, the military judge elected to determine for himself the reasons for the delay. After excusing the court members and recessing the court, the judge removed his robe and left the courtroom.

6. Prior to this recess, CPT Henry had attempted to convince JB to testify. JB was a reluctant witness who was embarrassed by his alleged sexual encounter with the appellant, and afraid of confronting him in court. As late as the evening before his scheduled testimony, JB's actual appearance at trial was uncertain. Mr. Bernstein, angry at the long morning delay, and concerned about JB's well-being and the order in which the witnesses were being called, was preparing to depart with JB. Captain Henry's efforts further angered Mr. Bernstein. The trial counsel, CPT Schwind, arrived and attempted to smooth things over with Mr. Bernstein, but he was still irate when the military judge entered the office.

7. The military judge's purpose was to ascertain what was causing the delay in JB's appearance. At the time the trial counsel called JB as a witness, the military judge believed that subpoenas had been issued. Mr. Bernstein informed the military judge that he and JB were not under subpoena. The trial counsel had not issued subpoenas to his own civilian witnesses, including JB and Mr. Bernstein. The trial counsel subsequently issued subpoenas to JB and Mr. Bernstein, after JB's testimony.

8. The judge then explained that JB could testify voluntarily that day, or that the trial could be delayed while subpoenas were issued, and the trial would continue at some future time. At that point, JB indicated that he would testify. To ensure that Mr. Bernstein did not further interfere, the military judge directed a government representative to call the military police. The military judge then returned to the courtroom.

9. Upon his return to the courtroom, the military judge called an Article 39(a), UCMJ, session to order. Captain Schwind was still absent; the assistant trial counsel, CPT Christensen, represented the government. The military judge described for the record

---

5. Upon the appellant's motion, we attached several statements, affidavits, and a memorandum as Defense Appellate Exhibits A–I. *Cf. United States v. Miller,* 48 M.J. 790 (N.M.Ct.Crim.App.

1998) (post-trial affidavits used to determine if military judge was required to disqualify himself).

what transpired with a government witness, Mr. Bernstein, during the four-minute recess:

> MJ: Mr. Bernstein, who I have met, is highly upset. He believes he was treated in an improper way. I could not have a conversation with Mr. Bernstein because I had this premonition that I would revisit everything I was about to say. I invited Mr. Bernstein in. I believe I called for the MP's to come here, is that correct?

10. In one of many comments from spectators, including officers of the court and lay persons, made throughout the trial, CPT Henry answered the question with, "Yes, sir, they're on their way." [6]

11. JB did not appear in the courtroom. Instead, CPT Schwind reentered the courtroom and informed the military judge that Mr. Bernstein was attempting to contact the Corps Staff Judge Advocate. The military judge responded:

> MJ: Everybody stay here. [Stepped down from the judge's bench.] Cooks, [referring to Specialist Cooks, a bailiff] you're my witness. Put your ears on.

12. During this second four-minute recess, the judge again entered the office where JB and Mr. Bernstein had been waiting. In an attempt to calm Mr. Bernstein, he touched Mr. Bernstein more than once on the shoulder or chest area. The nature of these touches was later disputed, being variously described by those involved or witness-

ing them as touches, pats, pushes, or smacks.[7]

13. During this confrontation, Mr. Bernstein said he was telephoning the Corps Commander, Lieutenant General Schwartz. The military judge responded to Mr. Bernstein that he "didn't give a fuck what General Schwartz[8] thought," that he was a judge and it was his job not to care what commanders thought.

14. At the time, Mr. Bernstein expressed his approval of the judge's blunt language, and made no protestation that the judge's touching him had offended him. The judge also informed Mr. Bernstein that his interference with the court-martial, including any interference in JB's appearance as a witness, could result in Mr. Bernstein being held in contempt of court.[9]

15. After this second confrontation, the judge and bailiff reentered the courtroom, followed by JB, who was directed to take a seat in the witness chair. The judge then called an Article 39(a), UCMJ, session to order, and summarized what had transpired during the recess as follows:

> MJ: Okay. Specialist Cooks and I went out to talk to Mr. Bernstein. Mr. Bernstein is apparently a good friend of [JB]. He is very protective of—[JB].

After describing Mr. Bernstein as being upset with CPT Henry, the military judge continued:

---

6. On more than ten occasions during the course of the trial, the military judge either solicited or received comments from spectators in the courtroom. These comments ranged from the innocuous (greeting an expert witness and acknowledging the presence of Mr. Bernstein's attorney) to discussions with CPT Henry, the Chief of Military Justice for the command prosecuting the appellant, about substantive and procedural matters. We find no material prejudice to the appellant, nor does he allege any, as a result of these unsworn comments from spectators. UCMJ art. 59(a).

7. While the record of trial reflects that the military judge touched Mr. Bernstein only during this second confrontation, the Defense Appellate Exhibits suggest that he may have done so during both confrontations. Neither the number of times Mr. Bernstein was touched nor the exact nature of the touches is determinative of the legal issues discussed, *infra*.

8. Major General (MG) LaPorte, the 1st Cavalry Division commander, referred the charges against the appellant to this general court-martial. Lieutenant General Schwartz, as the III Corps and Fort Hood commander, was MG LaPorte's immediate superior. In their R.C.M. 1105 submissions, the appellant's defense counsel specifically requested that a convening authority not located on Fort Hood take action in appellant's case, in part because of the military judge's suggestion that the commander, 1st Cavalry Division, should disqualify himself from taking action. The commander, U.S. Army Forces Command, after advice from his staff judge advocate, took action on the appellant's case.

9. Under questioning by the military judge during an Article 39(a), UCMJ, session, Mr. Bernstein agreed that this is what had transpired.

MJ: I went and reminded Mr. Bernstein that we weren't calling him as a witness at this point; we were calling [JB]; and that, we were going to have a trial. And that, all I wanted [JB] to do was come in and testify, and testify truthfully, and give [JB] an opportunity to put this incident behind him in one way or another this week. And that, if people all wanted to go home there were no subpoenas, but that would just cause the government to issue subpoenas next week, and this trial would continue in a few more weeks. And [JB], my recollection is you decided that you wanted to come in and put this behind you today and not worry about it later. Is that right?

WIT [JB]: Yes—yes, sir.

16. The military judge then asked SPC Cooks, seated in the gallery, if his summary was correct, and SPC Cooks responded that it was. A more detailed account of what happened during these two four-minute recesses was serially disclosed as the trial progressed.

17. The members were recalled, and JB was sworn and testified. JB was closely cross-examined by Mr. Carlson; the inquiry included his relationship with Mr. Bernstein. The military judge recessed the court-martial after JB's testimony.

18. During the recess, the Chief Circuit Judge informed the military judge that Mr. Bernstein had complained about the military judge's treatment of Mr. Bernstein.

19. Just prior to returning to the courtroom at the end of this recess, the military judge and the trial counsel had a brief, ex parte conversation. The military judge informed the trial counsel, CPT Schwind, about the complaint, and indicated his intention to take the complaint up in an Article 39(a), UCMJ, session with Mr. Bernstein on the stand. Concerned that Mr. Bernstein's reaction to being questioned about his confrontations with the military judge might impair his willingness to testify about the facts of the case, CPT Schwind requested that Mr. Bernstein be permitted to testify on the merits, followed by any Article 39(a), UCMJ, session. The military judge agreed to this request. This conversation was not conveyed to the defense until after the trial concluded.

20. Mr. Bernstein was then called as a government witness. His testimony was rambling, histrionic, and self-aggrandizing.[10] While he had no direct knowledge of the charged offenses, his substantive testimony explained how the alleged offenses involving JB, CS, and RW came to be disclosed.

21. After Mr. Bernstein's testimony on the merits, he remained on the witness stand during an Article 39(a), UCMJ, session. The military judge advised the parties that Mr. Bernstein had accused the military judge of assaulting him and questioned Mr. Bernstein about the incident. Before counsel had an opportunity to question Mr. Bernstein, the court took a recess. Mr. Bernstein's personal attorney, who had entered the courtroom before the judge began questioning Mr. Bernstein, had, at the conclusion of the judge's questions, requested an opportunity to consult with his client.

22. After the recess, both the trial counsel and the civilian defense counsel had the opportunity to question Mr. Bernstein about what had transpired between Mr. Bernstein and the military judge. The military judge's purpose in permitting such questioning was to allow the parties to place the facts on the record, and to thereafter make any motions or take any other action either side felt warranted.

23. When counsel finished questioning Mr. Bernstein, the military judge made several comments for the record. He noted that he took both CPT Schwind and Mr. Carlson with him during the first recess. Mr. Carl-

10. Mr. Bernstein directed counsel to rephrase a question, first requested a glass and then a pitcher of water, and asked permission to remove his jacket. He chuckled over the fact he employed a number of senior noncommissioned officers at his pizza business, informed the court that he ran for city council, and had appeared on PBS. He alternatively denigrated JB's appearance when he first came to work at Pizza Time, and justified making him a part-owner of the business a few months later. His answers to questions were frequently nonresponsive. Another witness characterized him as wanting "to be in control of everything," and having "a halo around him I ain't never seen before."

son said nothing in response that would indicate the judge's assertion was erroneous. The military judge then described the events during the second recess. That description was, in general, in accord with our factual findings of what occurred.[11] Afterwards, he asked if counsel for either side had anything to add. Both declined. The military judge then offered Mr. Bernstein an opportunity to add anything he wished. Mr. Bernstein declined, and apologized.

24. After a twenty-nine minute recess, the military judge convened another Article 39(a), UCMJ, session, and afforded counsel for both sides an additional opportunity to conduct voir dire of the military judge and to make any challenges they deemed necessary. Counsel for both sides expressly declined voir dire and challenge. The court members were recalled and trial recommenced.

25. Mr. Bernstein's out-of-court conduct during the remainder of the trial provided the defense several more opportunities to attack the government's case. During cross-examination of Mr. Emerick, the government's expert witness, Mr. Emerick disclosed that Mr. Bernstein had attempted to discuss the case with him and that he had rebuffed Mr. Bernstein's attempt. Several witnesses, government and defense, testified before the court members that Mr. Bernstein made comments in the witness waiting area that reflected his animosity toward the appellant and his belief that the appellant was guilty of the offenses, and that characterized the appellant as a pedophile. Further, Staff Sergeant Melton, a defense witness, indicated that Mr. Bernstein was instructing witnesses in how to testify by telling them to answer the trial counsel's questions with a narrative while giving the defense counsel's questions short answers. Over strong government objections, the military judge permitted the defense to present this evidence for its tendency to show Mr. Bernstein's bias against the appellant.

26. Based on a perception that these (and other) evidentiary rulings meant the military judge was biased in favor of the defense or was manipulating the trial to force an acquittal to avoid a record of the judge's conduct, the trial counsel requested that the military judge recuse himself.[12] The judge declined to do so.

27. The confrontation between the military judge and Mr. Bernstein remained an issue throughout the trial. Most of what transpired was eventually disclosed to the court members.

28. In an Article 39(a), UCMJ, session held in the late afternoon of 21 August, the military judge announced that Mr. Bernstein had filed an assault complaint against the military judge with the military police, and that Mr. Bernstein had also contacted the press. The next day, shortly before closing arguments and instructions, counsel and the military judge learned that Mr. Bernstein had not only filed the complaint, but that the incident was the subject of an article in the local newspaper.

29. The defense sought to place evidence of Mr. Bernstein's complaint before the court members, arguing, "[I]t's relevant to our case because from my opening statement to now I've been saying that this guy controls [JB] and he controls witnesses, and it's not beyond him to take something that's not true . . . and make more of it." To that end, the defense prepared a stipulation of fact.

30. The government opposed the stipulation, not because it was not reflective of what had transpired, but because they believed the matter was irrelevant. The trial counsel conceded that the disclosure would be prejudicial to the government's case:

MJ: Do you know where your Achilles' heel is in this case?

TC: Oh, yes, sir.

MJ: Where do you think it is?

TC: It's wherever Mr. Bernstein is this morning, sir.

---

11. The ex parte conversation between the trial counsel and the military judge concerning the order in which Mr. Bernstein's testimony was presented was the only substantive omission.

12. The civilian defense counsel also asked the military judge to recuse himself at one point during the trial. This request had nothing to do with the confrontation with Mr. Bernstein. The military judge declined to recuse himself. The appellant does not challenge that decision.

31. The military judge pressured the trial counsel to stipulate, telling him that he found the evidence relevant, and that he could either produce Mr. Bernstein as a witness or stipulate to the facts.

32. The military judge and both counsel viewed the stipulation as the best alternative to Mr. Bernstein's return to the courtroom. For reasons that were at least partially tactical, the defense opposed any delay to obtain Mr. Bernstein's testimony. The prosecution recognized the devastating effect another appearance by Mr. Bernstein could have on their case, and expressly declined the military judge's invitation to bring him back into the courtroom to testify.

33. The issue of whether the military judge had or could become a witness in the case was first raised by the trial counsel, CPT Schwind. Under pressure by the military judge to stipulate or to produce Mr. Bernstein, whose subpoena had expired, CPT Schwind cautioned that the military judge might thereafter be needed as a witness. The military judge responded that calling the military judge as a witness raised the specter of a mistrial, with attendant double jeopardy concerns.

34. The military judge edited the stipulation of fact ultimately agreed to by the parties (Defense Exhibit D). While the military judge initially suggested that references to him in the stipulation be masked by referring to him as a "senior judge advocate" or other euphemisms, the only major modification to the defense proposal (Appellate Exhibit XIX) was the elimination of a reference to the Corps Commander, substituting therefor the words "senior officers."

35. The stipulation read to the court members was an accurate summary of the facts as known to counsel and the military judge. The stipulation covered the confrontation between Mr. Bernstein and the military judge, including the fact that the judge touched Mr. Bernstein. It included Mr. Bernstein's complaint against the judge, which alleged that the judge had assaulted and cursed him. It also covered the substance of the Article 39(a), UCMJ, session in which Mr. Bernstein apologized. The stipulation further detailed Mr. Bernstein's pursuit of his complaint with senior officers on Fort Hood, the Military Police, and the Killeen Daily Herald (a local newspaper). The stipulation treated the military judge's use of foul language as an allegation by Mr. Bernstein, although the parties to the stipulation were well aware that the military judge had admitted on the record his use of such language. It was the last piece of evidence heard by the court members before they began their deliberations.

36. After the appellant and counsel for both sides agreed to the stipulation of fact, counsel and the military judge discussed whether the stipulation required recusal of the military judge under R.C.M. 902, including whether the military judge had personal knowledge of "disputed evidentiary facts." Both counsel indicated that they did not believe he did, as there were no facts in dispute.

37. After reading the stipulation of fact to the court members, the judge cautioned the members about his role in the trial, and asked if the stipulation caused them to have any reservations at all about his conduct. No court member expressed any reservations about the military judge's conduct.

38. The court members acquitted the appellant of all offenses involving JB and CS, the purported civilian victims in Mr. Bernstein's direct sphere of influence. While RW's initial disclosure of sexual abuse by the appellant was precipitated by Mr. Bernstein's call to his father, there was no direct contact between RW and Mr. Bernstein, and the members convicted the appellant of sodomy of RW by force and without consent. The court members also convicted the appellant of indecent assault and indecent acts offenses involving the soldier and former soldier victims who had no connection with Mr. Bernstein.

## DISCUSSION

### I. Propriety of the Judge's Conduct in General

The appellant urges us to find the military judge disqualified under R.C.M. 902(a), 902(b)(1), 902(b)(3), and 902(b)(5)(C). As

R.C.M. 902(a) is a general disqualification provision and permits waiver, while R.C.M. 902(b) deals with specific factual disqualifying criteria that may not be waived, we analyze the military judge's actions separately under the two sections of the rule. However, we first address the propriety of the military judge's conduct in general.

We recognize that we are reviewing the military judge's actions with the benefit of hindsight. We also recognize that there were legitimate reasons for the judge's frustration with the pace of the proceedings. The trial was initially set for nearly two and a half months after the appellant was arraigned, and had already been rescheduled for more than a month beyond the original trial date. A series of delays had already kept a court-martial panel and witnesses waiting most of the morning. When the first witness was called, the defense immediately sought yet another recess. That witness was followed by a call for JB, who did not appear, even in the face of an order by the judge to report to the courtroom. Under these circumstances, even a judge with the most judicial of temperaments might well have become frustrated with the government's seeming inability to get JB into the courtroom.

However, with the luxury of detached reflection unencumbered by the pressures that frequently assail trial judges, we find that the military judge's actions were at least intemperate. With that same detached reflection, we find no evidence of animus toward either the appellant or the government.

■ The paramount obligation of a military judge is to ensure that each accused receives a fair trial. Military judges have considerable latitude in how they carry out this obligation. They are responsible for exercising "reasonable control over the proceedings" in courts-martial to which they are detailed. See R.C.M. 801(a)(3). They possess contempt powers, see UCMJ art. 48, 10 U.S.C. § 848, including those over persons committing disorders in the area of the court that impede the process of the court.[13] See R.C.M. 801(b); Rule for Courts–Martial 809(a) discussion [hereinafter R.C.M. discussion].

Our rules of evidence contemplate judicial involvement in securing the testimony of reluctant witnesses. Cf. Military Rule of Evidence 804(a)(2). Many court decisions have commented on the military judge's obligation to use the power of his position to make reluctant witnesses testify. See, e.g., United States v. Hines, 23 M.J. 125, 126, 133 (C.M.A. 1986). The military judge's authority has been used to insulate witnesses from possible and actual command influence. See, e.g., United States v. Rivers, 49 M.J. 434, 441 (1998) (military judge instructed each appropriate witness to report any retribution for their testimony to the military judge); United States v. Plumb, 47 M.J. 771, 779 (A.F.Ct. Crim.App.1997) (military judge criticized for failure to take corrective action to ensure witnesses testified without interference).

We also recognize the military judge's obligation to "[e]nsure that the dignity and decorum of the proceedings are maintained." R.C.M. 801(a)(2). As the discussion to R.C.M. 801(a)(2) further explains, courts-martial should be conducted in a calm atmosphere reflective of the seriousness of the proceedings. A military judge who departs the bench not once, but twice, to interject himself into matters that, at least initially, fell more properly into the purview of the trial counsel, cf. R.C.M. 502(d)(5) discussion, is not displaying the judicial demeanor and temperance that the military justice system requires.[14] Cf. Cannon 3A(2); (3), American Bar Association Code of Judicial Conduct (1972).[15]

---

**13.** A person interfering with a witness in the vicinity of the courtroom might well be guilty of contempt. See Rule for Courts–Martial 809(a) discussion.

**14.** The record of this trial is replete with comments from the military judge to counsel for both sides reflecting his impatience with the pace of the proceedings. Efficiency is a laudable goal, but a military judge who is overly concerned with trial efficiency risks errors of judgment that may compromise the trial results.

**15.** The appellant claims that the military judge's actions in securing the testimony of JB and Mr. Bernstein effectively made him counsel for the government. As noted above, we do not view the military judge's responsibilities vis-à-vis witnesses so narrowly. While JB, at least, testified without a subpoena, the record is clear that he

An impatient and even an intemperate judge is not, however, automatically disqualified from presiding over a trial by court-martial. We must, therefore, consider this military judge's conduct under the disqualification criteria set forth in R.C.M. 902, recognizing that the right to an impartial judge is a right of constitutional dimensions. *See Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 617–18, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *United States v. Wright,* 52 M.J. 136, 140 (1999); *cf. United States v. Aue,* 37 M.J. 528, 531 (A.C.M.R.1993).

## II. Disqualification Under R.C.M. 902

Rule for Courts–Martial 902 implements and expands upon the Article 26, UCMJ, 10 U.S.C. § 826, prohibition against the military judge appearing as a witness for the government.[16] The current rule is based upon and closely parallels the judicial disqualification provisions found in 28 U.S.C. § 455.[17] *See Wright,* 52 M.J. at 141; *Rivers,* 49 M.J. at 444; Rule for Courts–Martial 902 analysis, *Manual for Courts–Martial,* United States, (1995 edition) at A21–49 [hereinafter R.C.M. analysis]. Both the federal statute and R.C.M. 902 are based upon Cannon 3 of the *American Bar Association's Code of Judicial Conduct. See United States v. Kincheloe,* 14 M.J. 40, 50 (C.M.A.1982); R.C.M. 902 analysis at A21–49.

## A. Disqualification Under R.C.M. 902(a)

Rule for Courts–Martial 902(a) provides in pertinent part "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Rule for Courts–Martial 902(e) permits waiver of disqualification under R.C.M. 902(a) "provided it is preceded by a full disclosure on the record of the basis for disqualification." A judge is presumed to be qualified. *See United States v. Allen,* 31 M.J. 572, 601 (N.M.C.M.R.1990) *aff'd,* 33 M.J. 209 (C.M.A.1991).

██ So long as his impartiality towards the parties cannot reasonably be questioned, a military judge is not disqualified under this Rule. The test is an objective one, judged from the standpoint of a reasonable person observing the proceedings. *See United States v. Burton,* 52 M.J. 223 (2000). An appearance of partiality exists when an impartial, fully-informed observer "would entertain a significant doubt that justice would be done in the case." *Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985); *see also Wright,* 52 M.J. at 141; *Wilson v. Ouelette,* 34 M.J. 798, 799–800 (N.M.C.M.R.1991).

██ The standard of review is abuse of discretion. *See Rivers,* 49 M.J. at 444; *United States v. Elzy,* 25 M.J. 416, 417 (C.M.A. 1988); *Liteky v. United States,* 510 U.S. 540, 557, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)(Kennedy, J., concurring in judgment) ("a judge should be disqualified only if it appears that he or she harbors an aversion, hostility, or disposition of a kind that a fair-

---

chose to testify after the confrontation between the judge and Mr. Bernstein, rather than waiting for a subpoena to be issued and being compelled to appear at some later date.

16. Military law has a long history of prohibiting members of the court-martial from serving as witnesses for the prosecution. *See* Articles of War 8 and 9, *Manual for Courts–Martial, United States Army,* 1917 [hereinafter *MCM, 1917*], app. 1. See also *MCM, 1917,* para. 129, 131 (members may not serve as witnesses for the prosecution but may be witnesses for the defense). Interestingly, Colonel Winthrop indicates that court members could be called as witnesses without affecting the legality of the proceedings, although he noted that the practice should be avoided. *See* W. Winthrop, *Military Law and Precedents,* 254 (2d ed.1920).

17. The military rule is not taken verbatim from the federal rule. There are some differences in terminology; the federal statute does not contain references to "trial counsel," "investigating officer," "staff judge advocate," etc., but the substantive provisions are very similar. One substantive difference is that R.C.M. 902(b)(3) requires disqualification when the military judge is a "witness." The federal rule requires disqualification only when the judge has been a "material witness." *See* 28 U.S.C. § 455(b)(2) and (3). The Article 26, UCMJ, prohibition against the military judge being a witness for the prosecution appears to be the basis for this distinction in these generally parallel rules.

minded person could not set aside when judging the dispute").

The burden of demonstrating a disqualification is on the party requesting such disqualification. A reasonable factual basis must be established; surmise or conjecture is not sufficient. *See United States v. Soriano,* 20 M.J. 337, 340 (C.M.A.1985); *United States v. Amos,* 26 M.J. 806, 809 (A.C.M.R.1988); *cf. Wilson,* 34 M.J. at 799–800.

Rule for Courts–Martial 902(a) is not a catchall rule of disqualification for intemperate judges. Its focus is on a lack of impartiality. A judge may be caustic, short-tempered, or even hostile during a trial without losing his or her impartiality. *See Liteky,* 510 U.S. at 555–56, 114 S.Ct. 1147. Judges have made injudicial remarks without running afoul of R.C.M. 902(a)'s proscriptions. *See, e.g., United States v. Miller,* 48 M.J. 790, 791–92 (N.M.Ct.Crim.App.1998) (military judge's comment that appellant's drug overdose might kill him, obviating the need for trial, not disqualifying); *United States v. Ettinger,* 36 M.J. 1171, 1172–73 (N.M.C.M.R.1993) (judge's comments that defense counsel's critique of the judge in an earlier case made the judge sound like a KKK member); *cf. United States v. Gregory,* 656 F.2d 1132, 1136–37 (5th Cir.1981) (28 U.S.C. § 455(a) not violated when judge said he hoped counsel choked on judge's financial disclosure statement).

As the challenging party, the appellant "bears the burden of establishing facts which create a substantial doubt in the minds of reasonable persons with respect to the impartiality of the trial judge." *Amos,* 26 M.J. at 809 (citing *Soriano,* 20 M.J. at 340). What the appellant now alleges as disqualifying conduct is what transpired during the confrontations and the judge's in-court conduct.

The appellant's lack of specificity as to what constituted lack of impartiality makes his allegation less persuasive.

Turning first to the in-court conduct, we note initially that the judge's rulings during the course of a trial will rarely give rise to a challenge for lack of impartiality. *See Liteky,* 510 U.S. at 452, 556, 114 S.Ct. 1147; *United States v. Reed,* 2 M.J. 972, 978 (A.C.M.R.1976).

Our review of the record discloses no indication that the trial judge treated the appellant in less than an impartial fashion. The judge's rulings on admissibility of evidence were generally, although by no means exclusively, in the appellant's favor. While rulings against a party are generally not indications of lack of impartiality, rulings in favor of a party may serve to demonstrate that the judge treated a party in an even-handed fashion.

Two rulings in particular, may have been crucial in the appellant's acquittal of many of the charges: a ruling excluding evidence of uncharged misconduct (alleged sexual assaults on two other young men) and the various rulings permitting evidence of Mr. Bernstein's out-of-court conduct to demonstrate his bias.[18]

Turning to the two confrontations with Mr. Bernstein, the appellant's second basis for urging disqualification under R.C.M. 902(a), we discern no evidence of either partiality toward the government or against the appellant. While the military judge's actions were, in hindsight, regrettable, attempting to persuade a reluctant witness to testify—for either side—falls well within the responsibilities of the military judge. *See Hines,* 23 M.J. at 125, 126 n. 4. While such persuasive efforts generally occur in the courtroom, in

---

**18.** Although R.C.M. 902(d) requires sua sponte action as well as that taken at a request of a party, the fact that the defense did not move for recusal under R.C.M. 902(a) is some evidence that they did not consider the military judge's conduct with Mr. Bernstein to be evidence of partiality. While tactical considerations might lead some counsel to forego such objections, Mr. Carlson did not display any hesitation in asking the judge to recuse himself on the basis of his repeated cautions to defense counsel that coun-

sel's questions might open the door to damaging evidence. If Mr. Carlson had doubts about the judge's impartiality (or the appearance thereof) during the trial, we are confident that he would have raised them. *See Burton,* 52 M.J. 223 (failure of the defense to challenge military judge permits inference that the judge was impartial); *United States v. Howard,* 50 M.J. 469, 470–71 (1999) (failure to object and thus develop the record operates as a waiver of the military judge's continued presence).

this case the problem was getting the witness into the courtroom in the first place.

Even viewing what transpired as Mr. Bernstein suggests it happened, assaulting and cursing at a government witness is certainly not evidence of partiality toward the government. While a reasonable observer might question the judge's judicial temperament as a result, we do not believe a reasonable, objective person would therefore question whether the military judge was less than impartial toward the appellant.

A number of cases have concluded that a trial judge's disclaimer of partiality must be given great weight. *See, e.g., Wilson,* 34 M.J. at 802; *cf. United States v. Jarvis,* 22 U.S.C.M.A. 260, 262, 46 C.M.R. 260, 262, 1973 WL 14497 (1973). If the standard is an objective one, and we are confident that it is, the statements of the military judge are not conclusive, but they are evidence we may properly consider, and upon which an impartial observer might rely. *See Wright,* 52 M.J. at 141–42. Here, the judge forthrightly denied any nefarious or self-serving motivation during and after the confrontations. We concur with his self-assessment.

## B. Rule for Courts–Martial 902(e) Waiver

Assuming, arguendo, that the military judge should have disqualified himself based on a perception that he was not impartial, we conclude that such disqualification was affirmatively waived by the defense, after full disclosure on the record. The military judge repeatedly invited voir dire. Each time, the defense declined to exercise that opportunity. When asked if the defense desired to exercise a challenge, counsel declined to do so. *See Howard,* 50 M.J. at 471 (implying counsel's declination of opportunity to voir dire or challenge the judge was evidence of waiver).

While the appellant argues before this court that the military judge's disclosure was not "full," we are satisfied that the parties to the trial were provided with sufficient facts to make a reasoned decision to either inquire further or to decline to exercise a challenge, and thus the disclosure was adequate under R.C.M. 902(e).

The only salient fact which was not affirmatively disclosed by the military judge or by witnesses in the trial was the ex parte conversation between the military judge and the trial counsel about the order in which Mr. Bernstein's testimony on the merits and his allegations of mistreatment by the military judge would be presented. While we do not condone *any* ex parte contact between judges and counsel (or between judges and witnesses, for that matter), *see Allen,* 33 M.J. at 213, we are satisfied that this brief conversation was not significant and would not have altered the defense approach. *See United States v. Cornett,* 47 M.J. 128, 130 (1997) (brief ex parte contact with trial counsel not disqualifying). The federal courts have likewise held that an ex parte meeting with counsel is not, by itself, disqualifying. *See Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 932 (3d Cir.1974) (citing *United States v. Tropiano,* 418 F.2d 1069, 1077 (2d Cir.1969)).

Given Mr. Bernstein's volatility, hearing his substantive testimony first, and his testimony about what transpired between him and the trial judge later, made absolute sense. The order in which evidence is presented is well within the discretion of the trial court.

The succinct summation of our superior court in *United States v. Campos* is equally applicable here:

> Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to *voir dire* the military judge and to present evidence on the question, and where such record demonstrates that appellant obviously was not prejudiced by the military judge's not recusing himself, the concerns of RCM 902(a) are fully met.

42 M.J. 253, 262 (1995). We conclude that the appellant has failed to carry his burden to demonstrate the judge's disqualification under R.C.M. 902(a).

## C. Disqualification Under R.C.M. 902(b)

 Turning next to the appellant's allegations that the military judge was disqualified under R.C.M. 902(b), we must determine

first if any of the specific disqualifying factors exist. Once again, we note that the moving party bears the burden of establishing a reasonable factual basis for disqualification. *See Amos,* 26 M.J. at 809 (citing *Soriano,* 20 M.J. at 340); *United States v. Martinez,* 19 M.J. 652, 653 (A.C.M.R.1984). The standard of review is abuse of discretion. *See Rivers,* 49 M.J. at 444. Disqualification under R.C.M. 902(b) cannot be waived. *See* R.C.M. 902(e).

Rule for Courts–Martial 902(b)(1) mandates disqualification of a military judge for either of two reasons: (1) personal bias or prejudice concerning a party or (2) personal knowledge of disputed evidentiary facts concerning the proceeding.

### 1. Personal Bias or Prejudice

Much of the analysis above pertaining to disqualification under R.C.M. 902(a) is applicable to our consideration of potential disqualification for bias or prejudice. While lack of impartiality is judged objectively, based upon appearances, and bias and prejudice are determined based on the judge's subjective state of mind, as ascertained by the facts, the concepts are similar and have been equated. *See Liteky,* 510 U.S. at 552–53, 114 S.Ct. 1147. The appellant has the burden of establishing that any bias or prejudice is personal and stems from an extrajudicial source. *See Martinez,* 19 M.J. at 653, 655; *Reed,* 2 M.J. at 976. The military judge's disclaimer of bias is entitled to considerable weight. *See Reed,* 2 M.J. at 977. Bias must be toward a party, not a witness or counsel. *Cf. id.* at 976.

The record in this case is devoid of evidence that the military judge harbored any personal bias or prejudice against the appellant. As the Supreme Court noted in *Liteky,* "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality. 510 U.S. at 555–56, 114 S.Ct. 1147. Even when the military judge was curt with or sarcastic toward counsel, he remained scrupulously polite and solicitous toward the appellant.

### 2. Disqualification as a Witness

Rule for Courts–Martial 902(b) provides that a military judge is disqualified if he has "personal knowledge of disputed evidentiary facts concerning the proceedings" (R.C.M. 902(b)(1)); "has been or will be a witness in the same case" (R.C.M. 902(b)(3)); or "[i]s to the military judge's knowledge likely to be a material witness in the proceeding," (R.C.M. 902(b)(5)). A "proceeding" includes appellate review. *See* R.C.M. 902(c)(1).

The parties to the trial squarely addressed the issue of whether the military judge was a witness. In response to a query in the discussions surrounding the stipulation of fact, counsel for both sides indicated they did not believe the judge had become a witness. The military judge ruled that he was not. As a legal conclusion, that determination is subject to de novo review.

During the course of a criminal trial, the military judge may become a "witness" to a variety of acts of consequence to the trial's outcome, ranging from the demeanor of witnesses to the reactions of an accused to the evidence against him. When a judge rejects a guilty plea after the providence inquiry discloses matters inconsistent with it, he may, nonetheless, sit as trier of fact in the contested trial that follows.[19] Obviously, in each of these instances, the military judge is a "witness," but does not become disqualified from sitting as the trial judge. *See, e.g., Soriano,* 20 M.J. at 341 (military judge not disqualified as accuser or as witness after presiding over earlier trial where the charged perjury and unauthorized absence purportedly occurred).

In interpreting disqualification issues arising under 28 U.S.C. § 455(b), the federal courts have applied the extrajudicial source doctrine. That doctrine, adopted as a significant and often determinative factor by the Supreme Court in *Liteky,* 510 U.S. at 555–56, 114 S.Ct. 1147, generally exempts knowledge

---

**19.** *See United States v. Bray,* 49 M.J. 300 (1998); *United States v. Winter,* 35 M.J. 93 (C.M.A.1992). Our court, however, has expressed a preference for recusal in such cases, and when the trial judge does not recuse himself or herself, we have required the judge to obtain a waiver from the accused. *See United States v. Cockerell,* 49 C.M.R. 567, 1974 WL 14121 (A.C.M.R.1974).

acquired in the course of a trial from disqualifying a judge. The practical rationale for this doctrine is easily discernable; otherwise, a party or counsel, disgruntled by judicial rulings, could force disqualification. Federal courts have extended the doctrine to include situations where the judge actually testified about interlocutory matters in the course of a trial. *See Continental Vending Machine Corp. v. Wharton (In re Continental Vending Machine Corp.)*, 543 F.2d 986 (2d Cir. 1976) (judge who testified on attorney compensation motion on behalf of bankruptcy trustee in another phase of bankruptcy proceeding not disqualified).

██ Ordinarily, a judge is not disqualified by his knowledge of matters occurring in the course of a trial. *See, e.g., Amos*, 26 M.J. at 809–10 (trial in absentia conducted by judge who arraigned accused). Our superior court has refused to specifically limit the extrajudicial source doctrine to matters occurring in the course of a particular trial. *Cf. Rivers*, 49 M.J. at 444 (military judge's previous involvement in command influence motion in companion case not disqualifying); *United States v. Zander*, 46 M.J. 558 (N.M.Ct.Crim.App.1997) (reading unpublished opinions setting aside courts-martial where appellant improperly acted as defense counsel did not disqualify trial judge).

██ While it is clear that what the military judge observes at trial does not make him a witness within the meaning of any of the R.C.M. 902(b) disqualifying factors, we must determine if the out-of-court confrontations in this case fall within the ambit of this doctrine.

We conclude that they do. In one of the confrontations, the judge was still wearing his judicial robes. In both, he identified himself as the judge in the case. He was attempting to perform a judicial function, using the weight of his office to convince a reluctant witness to testify, rather than on a mission clearly unrelated to the trial. As we have noted, the military judge's authority does not end at the courtroom door; he or she frequently exercises judicial authority outside the courtroom, in R.C.M. 802 sessions, or in issuing written judicial orders. If the extrajudicial source doctrine were strictly limited to cover only those matters occurring in the courtroom, a judge might well become disqualified by an innocent, but misguided question from a court member during a recess, or the receipt of an anonymous note concerning the offenses in chambers. The proper course of conduct for a judge in either of these hypothetical situations is to do what the military judge did here: put the substance of the contact on the record, permit voir dire, and determine if the issues raised are disqualifying.

Here, the confrontations were not disqualifying. While the judge was a participant in two confrontations with a government witness, the confrontation did not concern the substance of the offenses with which the appellant was charged. The confrontations merely provided further grist for the impeachment mill that comprised the bulk of the defense case. Mr. Bernstein's conduct—on and off the witness stand—provided many impeachment opportunities. The confrontations with the military judge were offered for additional impeachment, and had nothing to do with the substantive issues in the case.

Moreover, the parties stipulated to what took place. That stipulation of fact, drafted by the defense, and concurred in by the government, generally comports with our factual findings. When the parties have stipulated to facts, witnesses to those facts are not necessary. The factual stipulation removed any issue that the military judge might have to rule on his own credibility.[20] We conclude that the military judge was not, under the facts presented here, a witness in the case within the meaning of R.C.M. 902(b)(3). *See Allen*, 33 M.J. at 213 (testimony of witness about his ex parte conversation with judge not disputed and judge therefore not required to use his own knowledge of

---

**20.** To the extent that the judge modified the stipulation, one might argue that his own perceptions and knowledge of what transpired during the confrontations became interjected into the court-martial. However, upon our review of the draft stipulation and the one actually admitted and read to the court members, it does not appear that the military judge made any factual modifications.

conversation); *Kincheloe,* 14 M.J. at 49–50 (evidentiary matters known by judge are not disputed when the parties have entered into a stipulation of fact concerning them).

We are likewise satisfied that the military judge was not a trial witness within the meaning of R.C.M. 902(b)(1) and (5).[21] *See Kincheloe,* 14 M.J. at 49–50. However, the term "proceedings," as used in R.C.M. 902(b)(1) and (5) includes appellate proceedings. We conclude that our appellate admission of the military judge's statements (Defense Appellate Exhibits F & G) has now made the military judge a witness, but that any disqualification under R.C.M. 902(b) for that reason would not relate back to the time of trial. It would, however, bar this military judge from presiding over any further proceedings in this case, such as a hearing pursuant to *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967) or at a new trial. *Cf. Aue,* 37 M.J. at 530–31 (military judge's testimony on disqualification issue at *DuBay* did not invalidate trial).

### D. Waiver and Prejudice Under R.C.M. 902(b)

While we have concluded that the military judge was not disqualified because of actual bias or prejudice, or because he was a witness, assuming, arguendo, that these conclusions are erroneous, we next address the issues of waiver and prejudice. Rule for Courts–Martial 902(e) does not permit waiver of disqualifications under R.C.M. 902(b), but the concepts of invited error and timeliness, which have their roots in a waiver analysis, enter into our consideration of prejudice.

As we have earlier noted, a party raising the issue of disqualification for the first time on appeal bears a heavier burden than one who makes a timely trial objection. *See Noli v. Commissioner,* 860 F.2d 1521, 1527 (9th Cir.1988); *cf. Amos,* 26 M.J. at 809. If a mandatory disqualification existed at trial, it certainly did so prior to announcement of findings. By delaying his challenge of the military judge until appeal, the appellant arguably achieved a greater measure of double jeopardy protection, if we were to reverse his conviction and order a new trial.[22] The defense counsel expressly disavowed any desire to challenge the military judge under the witness disqualification provisions of R.C.M. 902(b). As our Navy–Marine Corps brethren noted in *United States v. Burrer,* the defense counsel's "evaluation of the situation is entitled to weighty consideration on appeal." 22 M.J. 544, 548 (N.M.C.M.R.1986).

Further, R.C.M. 902 must be read in conjunction with Article 59(a), UCMJ, 10 U.S.C. § 859(a). Disqualification as a witness under 902(b)(1), 902(b)(3), or 902(b)(5)(C) is not a jurisdictional defect.[23] *Cf. Burrer,* 22 M.J. at 545–47 (no prejudice although military judge was disqualified under R.C.M. 902(b) as he briefly served as Article 32, UCMJ, investigating officer in appellant's case; the facts were disclosed on the record and appellant declined to challenge the judge); *United States v. Edwards,* 20 M.J. 973 (N.M.C.M.R.1985) (no prejudice

21. Although the appellant urges the military judge's disqualification under R.C.M. 905(b)(5)(C) as a witness, that subsection only addresses "material" witnesses, not witnesses in general. A material witness is generally the sole witness (or one of very few witnesses) to, or a victim of, an offense. *Blacks Law Dictionary* 881 (5th ed.1979). The military judge was not a material witness to any of the charged offenses, nor was he the sole witness to any particular matter that transpired between himself and Mr. Bernstein. At a minimum, a trial counsel, JB, and SPC Cooks all witnessed some or all of the two confrontations.

22. In *United States v. Sherrod,* our superior court held that any action in a case after the disqualification of the military judge was "void." 26 M.J. 30, 33 (C.M.A.1988). Applied literally, that hold-

ing would mean that this appellant could face retrial on all charges and specifications—including those of which he was acquitted. As that issue is not before us, we decline to speculate whether the appellant could face a new trial on all charges and specifications, or only on those in which there was a guilty verdict. If the latter is true, the appellant gains a tactical advantage by withholding any challenge until after a verdict is entered. *Cf. United States v. Sanford,* 157 F.3d 987, 988–89 (5th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1500, 143 L.Ed.2d 654 (1999) (recusal motion untimely when moving party waits until after adverse decision before raising issue).

23. We express no opinion on whether serving as a witness for the government amounts to prejudice per se. *See* UCMJ art. 26.

to appellant where military judge served as legal advisor to convening authority during period of appellant's unauthorized absence). We must, therefore, test for prejudice to the appellant.

If any party to the trial was prejudiced by the confrontations between the military judge and Mr. Bernstein, it was certainly not the appellant. *Cf. Campos*, 42 M.J. at 258, 262 (finding that any prejudice from the military judge's perceived demotion for lenient sentencing philosophy would work in the appellant's favor). The confrontation played directly into the defense's theory, as the civilian defense counsel set it forth in his opening statement. He highlighted Mr. Bernstein as a manipulator who would use anyone to achieve his own ends. In spite of evidence legally and factually sufficient for a conviction, the court members acquitted the appellant of all offenses involving contact between Mr. Bernstein and the alleged victims. What part Mr. Bernstein's confrontations with the military judge played in those acquittals is speculative, but it certainly did not inure to the appellant's harm.

As we discern no possible prejudice to the appellant's substantial rights, the error, if any, in the military judge's failure to recuse himself—sua sponte or upon government motion—was harmless. *Cf. Elzy*, 25 M.J. at 419. We reiterate that we do not believe the military judge's actions in this case are to be emulated. By becoming embroiled in a confrontation with a witness, he left himself open to an assault complaint and raised serious issues concerning both his judgment and judicial temperament. Judges must not only maintain control over the courtroom; they must maintain control over themselves.

Once the confrontation occurred, by far the better choice would have been recusal and the subsequent detailing of another judge. While, under the unique circumstances of this case, we are confident that there was absolutely no prejudice from any error in the military judge's failure to disqualify himself, lack of prejudice may be more difficult to demonstrate under other facts. *Cf. United States v. Heriot*, 21 M.J. 11, 14 (C.M.A.1985) (court member's inelastic attitude on sentence did not taint findings, and under facts presented, did not taint sentence); *Vasquez v. Hillery*, 474 U.S. 254, 263, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (when basis for biased judgment exists, bias may be presumed).

### III. Instructional Error

The appellant contends that the military judge's findings instructions were erroneous and prejudicial. We agree that the instructions as initially given were erroneous, but conclude that the appellant was not prejudiced, as the instructions ultimately given before findings were reached were correct.

Immediately after the defense counsel's closing argument, the military judge realized that he had failed to instruct the court members on the mistake of fact defense. After a short recess, he gave the mistake of fact instruction, which was followed by the trial counsel's rebuttal argument and the judge's procedural instructions on voting. After nearly two hours of deliberations, the court members returned with a question about how force related to indecent assault.

The military judge's subsequent instruction was erroneous, a fact promptly noted by the trial counsel. After a short Article 39(a), UCMJ, session, the judge conceded his error. Over defense objection, the judge then gave the correct instruction.

 We review a military judge's decision to give an instruction and the instructions actually given de novo. *Cf. United States v. Maxwell*, 45 M.J. 406, 424–25 (1996). The standard of review is abuse of discretion. *Cf. United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993).

 The instructions ultimately given were correct. While confusing instructions may give rise to a finding of prejudicial error, *see United States v. Curry*, 38 M.J. 77 (C.M.A.1993), the appellant was not prejudiced in this case. The timing of the instruction on the mistake of fact defense actually highlighted the defense to the court members. The correction made to the indecent assault instruction may not have benefited the appellant, but the instructions ultimately given were a correct statement of the law. The defense was not entitled to an instruction that misstated the government's burden.

*See United States v. Poole,* 47 M.J. 17 (1997) (judge not required to give defense-requested instruction that misstates law); *cf.* R.C.M. 920(e) (military judge required to explain elements of offense, lesser included offenses, and any special defenses in issue); *United States v. Mance,* 26 M.J. 244, 254 (C.M.A. 1988) (military judge obliged to instruct on elements of offense, and intent and knowledge elements included therein).

We have considered the remaining assignments of error and the matters personally raised by the appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

The findings of guilty and the sentence are affirmed.

Judge CARTER and Judge NOVAK concur.