UNITED STATES, Appellee,

v.

Bryan R. WRIGHT, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 98–0873.
Crim.App. No. 97–0662.

U.S. Court of Appeals for
the Armed Forces.

Argued May 11, 1999.

Decided Sept. 30, 1999.

CRAWFORD, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN, GIERKE, and EFFRON, JJ., joined.

For Appellant: *Lieutenant John D. Holden*, JAGC, USNR (argued).

For Appellee: *Lieutenant James E. Grimes*, JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler*, USMC, and *Commander Eugene E. Irvin*, JAGC, USN (on brief); *Commander D.H. Myers*, JAGC, USN.

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted by officer and enlisted members of violating a lawful general order, larceny, and forgery (3 specifications), in violation of Articles 92, 121, and 123, Uniform Code of Military Justice, 10 USC §§ 892, 921, and 923, respectively. The convening authority approved the sentence of a bad-conduct discharge, 30 days' confinement, partial forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. We granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION BY NOT RECUSING HIMSELF WHERE HE HAD PREVIOUSLY DEVELOPED A CLOSE WORKING RELATIONSHIP WITH A KEY GOVERNMENT WITNESS AND ALREADY FORMED AN OPINION AS TO THAT WITNESS' HONESTY AND TRUTHFULNESS.

II

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE SEIZED DURING AN IMPROPER SEARCH OF APPELLANT'S ROOM.

III

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT TO NCIS UNDER THE "FRUIT OF THE POISONOUS TREE" DOCTRINE, WHERE THE STATEMENT WAS THE DIRECT RESULT OF AN IMPROPER SEARCH OF APPELLANT'S ROOM.

For the reasons set forth below, we affirm the decision of the Court of Criminal Appeals.

FACTS

The military judge announced for the record that he had been "closely associated" with Naval Criminal Investigative Service (NCIS) Agent G. Gregory Munroe, whom the military judge conceded was "an important witness" on the motion to suppress. Before

litigating the motion, the military judge detailed his relationship with Agent Munroe, as follows:

[I] know Special Agent Munroe because I was stationed at the Naval Legal Service Office, Northwest Pacific, in Yokosuka, Y–O–K–O–S–U–K–A, Japan. From the summer of 1993 to the spring of 1996, Special Agent Munroe served out of a satellite office, the main office being Yokosuka, Japan. His satellite office being in Yokohama, Japan. I was the senior trial counsel at the Naval Legal Service Office Northwest Pacific.

I worked a number of cases with him including a major child sexual molestation case [in] which we did a lot of work together. I think those are the relevant facts. As far as opinions of Special Agent Munroe, having worked with him over those three years, I came to the opinion that he was an honest and trustworthy person, and he was a very competent NCIS agent.

Upon questioning by defense counsel, the military judge stated that he had a "high opinion" of Agent Munroe's "honesty" and "trustworthiness." Asked if that opinion would affect his potential rulings, the military judge responded at some length in these words:

I'll give you this answer and see if this helps. Anybody who serves in the United States Marine Corps as well as anybody who serves in the Naval Criminal Investigative Service who comes to testify here today will immediately, by me, be given a certain amount of credence because I believe both organizations by the nature of the way that they go about selecting the people that serve with them, whether it be the Marine Corps or whether it be the Naval Criminal Investigative Service, tend to weed out dishonest and untrustworthy people. I guess by virtue of a person serving in the Marine Corps or by virtue of a person serving in the Naval Criminal Investigative Service, I would tend to believe what they had to say until what they had to say was controverted by evidence or otherwise.

Now, if what Special Agent Munroe has to say contradicts with [sic] someone else, I'm going to compare the way they give their testimony, the credibility of what they have to say, their demeanor in court, and all of that. So, I don't think, as far as who you're telling me is going to testify here today, anybody has any leg up with me on credibility because as I understand it, the people coming here to testify today, including the accused, either belong in the Marine Corps or the Naval Criminal Investigative Service.

I will also tell you that I suppose there are certain people by virtue of their occupation that may cause me to be skeptical about their trustworthiness before they even speak, but I can't think of any occupation off the top of my head. I would tend to believe that people want to be trustworthy and want to take the oath of this court seriously.

So, in general, in hearing witnesses, my standard as a judge is that the person is being trustworthy until they demonstrate otherwise by their own testimony or the evidence that either counsel brings up tends to show that they are not being trustworthy. So, I guess Special Agent Munroe, even if I didn't know him, if he were to [sic] walk into this court-martial with—like all witnesses, with me believing that they are going to be truthful with all of their answers.

I just mention the fact that I have had this contact with him because I think I need to. But I don't think it gives him a leg up with me as far as whether or not I'm going to believe him anymore than the other NIS [sic] agent or with the accused since I understand those are going to be our three witnesses.

\* \* \*

[Knowledge of Agent Munroe's performance would not serve as a "backdrop to the way [I] evaluate his testimony."] Because that would be contrary to my duty as a military judge. Just as when—to give you an example, when I hear a urinalysis case, by and large I leave out of the courtroom my exposure to the mechanics of the urinalysis process and rely upon the infor-

mation given to me by the counsel in making the decision, be it a motion or be it the merits of a charge. The same way with a person who comes into this courtroom. I'm going to base my decision on what I hear in the courtroom and what you all as counsel present to me, and I am going to do what I've been instructed to do as a judge and that is to leave such experiences outside the courtroom.

\* \* \*

[I] believe this particular [sexual molestation] case was the one in which he was the agent who came aboard the aircraft carrier USS Independence and took the first statement from the accused, and that was a pretty important statement to cracking the case. I believe then we would see each other on a case about once every two months. In other words, out of every two months may be one case, if I was prosecuting, he would be involved in it. So, that's about as frequently as I would see him, though, I would probably see him sometimes when he was working a case that was being handled by a prosecutor working for me since I was the head prosecutor.

In response to a final question from defense counsel, the military judge agreed that when he worked with Agent Munroe, the military judge "had to depend upon [Agent Munroe's] credibility and his skill as an agent in prosecuting cases."

Defense counsel asked that the judge excuse himself in light of his relationship with Agent Munroe. Defense counsel noted that "an outside person looking in could reasonably infer or question [the military judge's] partiality." The military judge denied this challenge, and again he went to some lengths in explaining his reasoning:

[I] will state for the record that I think the military justice system anticipates, as a small community as we are, that we're going to know witnesses and members within our community. And I think that most of the courts that we prosecute, we

have had some sort of outside contact with witnesses and members.

I think the key thing is whether or not I'm able to put aside my professional relationship with Special Agent Munroe, and I can, and make a decision on this motion. I will not hesitate to make a finding that will question the veracity of his testimony if I find that the facts fall out. I will not consider anything that I know of him professionally as a prosecutor in making a decision. Furthermore, I will add that since it did not come out in our discussion that I have had no social relationship with Special Agent Munroe and I—the only thing I know about him are those times when we've had contact with each other where his business has crossed paths with mine.

This issue must be viewed in light of the judge's action in ruling on appellant's motion to suppress the evidence obtained as a result of a consent search. Appellant claims his consent was involuntary in that it was coerced by threats to obtain a search authorization and search the room anyway. In light of the Government's enhanced burden on the issue of consent, appellant asserts that his consent was not shown to be voluntary by clear and convincing evidence. Mil.R.Evid. 314(e)(5), Manual for Courts–Martial, United States (1998 edition).[1]

To meet its burden, the Government first presented the testimony of two NCIS agents, G. Gregory Munroe and David L. Sanders. Both responded to appellant's barracks building to investigate a report that stolen checks were being written out for the pizza delivery man. The delivery man, himself a Marine, identified two individuals as suspects, appellant and Lance Corporal Francisco. During an interview, Francisco said he ordered the pizza and paid for it with a check given to him by appellant. At 0220 hours, appellant was read his rights and waived them. Agent Munroe followed his standard practice, which is to read the suspect each right and ask him for a verbal response if he understands it. If

1. The 1998 version of this provision is the same as the version applicable at trial, unless the con- trary appears.

he says he does, Agent Munroe has the suspect initial it on the rights' warnings form. After admitting that he understood all his rights and initialing the form, appellant did not want a lawyer and was willing to talk to Agent Munroe. Approximately 20 minutes later appellant executed a consent to search his barracks room. Before executing the consent to search, Agent Munroe had appellant read the form to himself and then verbally reaffirmed appellant's rights. When he was finished reading the consent-to-search form, Munroe asked appellant if he understood it and if he still consented to the search. He told appellant what the form was; what he would be looking for; that appellant did "not have to consent to a search"; that it was appellant's "prerogative" to grant or deny consent; and that appellant had the "right to refuse" to consent. The form which appellant read states, "I have been informed of my constitutional right to refuse to permit this search in the absence of a search warrant. In full understanding of this right, I have nevertheless decided to permit this search to be made." Appellant signed the consent-to-search form.

Additionally, appellant agreed that Agent Munroe may "remove and retain any property or papers found during the search. . . ." Appellant also agreed that his decision to authorize the search was made "freely and voluntarily and it is made with no threats having been made or promises extended to me." Agent Munroe testified that he did not tell appellant what would happen if he refused to consent, and he does not remember appellant asking about that. However, if appellant had asked, "we tell them if he refuses a search, we do have a right to apply for a search warrant. It doesn't mean we're going to get one or not, but we can apply for one." According to Agent Munroe, if any questions are asked or problems arise, they are documented and reported. There was no documentation or report in this case.

Appellant testified "for the limited purpose of this motion." Appellant testified that Agent Munroe asked for consent to search and that Agent Munroe said if appellant did not consent, "he would come back with a search warrant." Appellant claimed to have signed the consent form because "[t]he search was going to happen either way. . . . [Agent Munroe] said it would be better on [him] to go the easy way and just sign it." Appellant testified that he did not "believe" he read the consent-to-search form because he knew what it was. He acknowledged being told he "could refuse to let him search the room."

The military judge denied the motion to suppress the fruits of the search of appellant's room. After finding that appellant had "voluntarily waived" his Article 31, UCMJ, 10 USC § 831, rights, the military judge made the following findings:

> [T]he accused was asked to give a voluntary consent to search of his living spaces there at the barracks. The accused was permitted to read the consent form and did so. The evidence is very equivocal about whether or not the subject of what the agents would do if the accused refused to give consent [came up], but the most consistent and logical evidence received by this court and what this court makes a finding of is that if the subject came up or that [sic] the accused was informed is that if the accused did not give consent that the agents would thereby seek to get a warrant to search his quarters and that such an effort would depend upon an authority who had control over the barracks. The court found no coercion or threats in obtaining this voluntary waiver of his Article 31(b) rights or his voluntary waiver to the consent search form.

Therefore, looking at those circumstances, the court concludes that the special agents got free and unconstrained consent from the accused to search his living spaces.

## DISCUSSION

### a. Disqualification of Judge

■ An accused has a constitutional right to an impartial judge. *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). RCM 902(a), Manual, *supra*, states that "a military judge shall disqualify himself or herself in

any proceeding in which that military judge's impartiality might reasonably be questioned." The military judge is cautioned to "broadly construe" the possible grounds for challenge, but he or she should not leave a given case "unnecessarily." RCM 902(d)(1), Discussion.

Likewise, Canon 3E(1) of the ABA Model Code of Judicial Conduct (1990) provides: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned...." RCM 902(a) also has language virtually identical to that found in 28 USC § 455(a), which calls for Federal judges, magistrates, and justices to disqualify themselves "in any proceeding in which [their] impartiality might reasonably be questioned." The exhortation of the statute is designed to foster the appearance of justice within the judicial system. *See Parker v. Connors Steel Co.*, 855 F.2d 1510, 1523 (11th Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989).

■ RCM 902(b) lists five specific grounds requiring disqualification, including "personal bias or prejudice" (b)(1); or when the judge is related "within the third degree" to "a party to the proceeding" (b)(5)(A) or an individual who is "likely to be a material witness" (5)(C). The Manual rule, the Canon, and the Federal statute are viewed objectively where no actual bias or prejudice is shown. *Edelstein v. Wilentz*, 812 F.2d 128, 131 (3d Cir.1987); *see Gray v. University of Arkansas at Fayetteville*, 883 F.2d 1394, 1397 (8th Cir.1989). RCM 902(a) is assessed not in the mind of the military judge himself, but "rather in the mind of a reasonable man ... who has knowledge of 'all the facts.'" *United States v. Sherrod*, 22 MJ 917, 920 (ACMR 1986), quoting *United States v. Martinez*, 19 MJ 652, 654 (ACMR 1984), *pet. denied*, 21 MJ 27 (1985), *Sherrod rev'd on other grounds*, 26 MJ 30 (CMA 1988). Nevertheless, despite an objective standard, the judge's statements concerning his intentions and the matters upon which he will rely are not irrelevant to the inquiry. *See United States v. Campos*, 42 MJ 253 (1995); *Jackson v. Fort Stanton Hospital and Training School*, 757 F.Supp. 1231 (D.N.M.1990), *rev'd*

*in part on other grounds*, 964 F.2d 980 (10th Cir.1992).

■ A military judge's decision on disqualification is reviewed for abuse of discretion. *United States v. Elzy*, 25 MJ 416, 417 (CMA 1988); *United States v. Davis*, 27 MJ 543, 545 (ACMR 1988), *pet. denied*, 28 MJ 155 (1989). There is no peremptory challenge against a military judge. Art. 41(b)(1), UCMJ, 10 USC § 841(b)(1).

The motion to disqualify a military judge may be made by a party or by the judge *sua sponte*. RCM 902(d)(1). Once made, it is the judge who decides this issue of law. RCM 801(a)(4) and (e)(1)(A).

■ To determine if there is a "possible ground for disqualification," each party is "permitted to question" the judge. RCM 902(d)(2). "When not flowing from an extrajudicial source, bias or prejudice will not necessitate disqualification unless it is so egregious as to destroy all semblance of fairness." J. Shaman, S. Lubet, & J. Alfini, *Judicial Conduct and Ethics* § 4.05 at 102 (2d ed.1995). Where association with a witness is concerned, a social relationship creates special concerns which a professional relationship does not.

■ Judges have broad experiences and a wide array of backgrounds that are likely to develop ties with other attorneys, law firms, and agencies. These relationships may be professional or social. Where such concerns arise regarding court members, a former professional relationship is not *per se* disqualifying. *United States v. Ai*, 49 MJ 1, 5 (1998)("prior work relationship" not disqualifying when there is "no evidence that the challenged member would 'naturally' favor or believe" a particular witness' testimony); *United States v. Napoleon*, 46 MJ 279, 283 (professional relationship "not *per se* disqualifying"), *cert. denied*, 522 U.S. 953, 118 S.Ct. 375, 139 L.Ed.2d 292 (1997); *United States v. Hamilton*, 41 MJ 22, 25 (CMA 1994)(no abuse of discretion to deny challenge against three members who had received legal assistance from assistant trial counsel), *cert. denied*, 513 U.S. 1084, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995).

### b. Validity of Consent

██ In determining whether a consent to search is voluntary, we look at "the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the Supreme Court held that the consent was not voluntary where the police claimed to already have a search warrant. However, in *United States v. James,* 40 F.3d 850, 876 (1994), the Seventh Circuit upheld the consent by co-defendant Ferguson where the officer threatened to "request" a warrant but had "a sufficient basis for seeking a warrant." In fact, the majority of courts hold consent to be voluntary where the police tell the suspect that if he does not consent, they will "obtain" or "seek" a search warrant, provided probable cause for a warrant actually exists. *See, e.g., United States v. White,* 979 F.2d 539, 542 (7th Cir.1992); *United States v. Talkington,* 843 F.2d 1041, 1049 (7th Cir.1988); *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied,* 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985). The statement, "seek a warrant," is not coercion in and of itself: it is not a dispositive circumstance in the inquiry. Thus, a valid consent may be obtained even after such a statement. Telling defendant's grandmother in *Bumper* that they had a warrant was thought to be ripe with coercion, but there is a significant difference between falsely claiming that one has a warrant and responding to a suspect that one would seek a warrant. Such latter statement would not foreclose a finding of voluntary consent. In fact, such a statement by the police would be an accurate response to the suspect's question.

### c. Conclusions

██ Even assuming Agent Munroe told appellant that if he refused to consent, he would get a search warrant, under the facts of this case, that would not undermine appellant's consent. Appellant had been fully advised that he had the right to refuse to give consent and he waived that right.

██ Appellant's motion did not pit the testimony of appellant against that of Agent Munroe. Further, while the judge initially indicated that Agent Munroe was "an honest and trustworthy person," he tempered this remark later when responding to questions. He said that he gives all Marine Corps members "a certain amount of credence ... until what they had to say was controverted by evidence or otherwise." He didn't think Agent Munroe "has any leg up" on the other witnesses. He indicated that he would base his decision on credibility "on what I hear in the courtroom."

Although the military judge could have expressed himself more lucidly, he correctly applied an objective standard in his ruling on the motion to recuse. The military judge stated that "the military justice system anticipates, as a small community as we are, that we are going to know witnesses and members within our community." This statement reflects the military judge's concern for the perception of the military community, and, as such, indicates he applied an objective standard.

The military judge's statement that he could put aside his professional relationship with the witness indicates he also made a subjective analysis, but his subjective analysis is a relevant factor in the application of an objective standard. The military judge's full disclosure, sensitivity to public perceptions, and sound analysis objectively supported his decision not to recuse himself, and these factors contribute to a perception of fairness. Under these circumstances, taking into account the judge's past relationship with the witnesses and his responses during the *voir dire,* we are satisfied that the judge's impartiality could not reasonably be questioned.

Additionally, the rights' advisement was very extensive in this case, with appellant initialing each right as he was advised. Appellant signed the consent-to-search form after he read it. This form clearly set forth his right to refuse to permit a search of his belongings absent a search warrant, and Agent Munroe verbally reinforced this. These factors indicate that regardless of whose testimony is found to be more credible, there was voluntary consent. Agent

Munroe's testimony is supported by Agent Sanders' testimony concerning the voluntariness of consent and standard procedures for obtaining it. If there was a difference between the testimony of the two agents, that could have been brought out by counsel at trial. It was not, thus supporting the judge's findings on the motion to suppress.

Therefore, the military judge was not required to remove himself from this case, and the judge did not err in denying the motion to suppress the results of the search.[2]

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

2. This moots Issue III.