# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## Michael E. SULLIVAN
### Captain (O-6), U.S. Coast Guard

### CGCMG 0285
### Docket No. 001-69-13

### 25 September 2014

General Court-Martial convened by Commander, Coast Guard Pacific Area.  Tried at Alameda, California, on 7 April 2009 and 4-17 June 2009.

| | |
|---|---|
| Military Judge: | CAPT Gary E. Felicetti, USCG |
| Trial Counsel: | LCDR Stephen J. Adler, USCG |
| Assistant Trial Counsel: | CDR Stephen P. McCleary, USCG |
| | LT Austin D. Shutt, USCGR |
| Civilian Defense Counsel | Mr. Eugene R. Fidell |
| Individual Military Counsel: | CAPT Steven J. Andersen, USCG |
| Assistant Defense Counsel: | LT David P. White, JAGC, USN |
| Appellate Defense Counsel: | Mr. Eugene R. Fidell |
| | CAPT Steven J. Andersen, USCG |
| | LT Jonathan C. Perry, USCGR |
| Appellate Government Counsel: | LCDR Amanda M. Lee, USCG |

### BEFORE
### McCLELLAND, NORRIS & GILL
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial composed of officer members.  Contrary to his pleas, Appellant was convicted of one specification of wrongful use of cocaine, in violation of Article 112a, Uniform Code of Military Justice (UCMJ).  The court sentenced Appellant to a fine of $5,000 and a reprimand.  The Convening Authority approved the sentence.  The Acting Judge Advocate General referred the case to this Court under Article 69(d).

Before this Court, Appellant has assigned the following errors:

I.      The military judge erred by not ordering a new panel of members be convened after the Convening Authority categorically excluded flag officers from Appellant's court-martial.

II.     The military judge abused his discretion by failing to recuse himself in light of Appellant's motion.

III.    The military judge erred by allowing an expert witness to give improper rebuttal testimony about the profile of cocaine drug users.

IV.     The military judge erred by denying the defense motion in limine to exclude all evidence from Psychemedics, including the testimony of Psychemedics' expert, because the company did not produce its standard operating procedures governing hair testing for cocaine.

V.      The staff judge advocate and deputy staff judge advocate testified to contested matters in a pre-trial Article 39(a) hearing. Therefore, they were disqualified from providing post-trial advice to the Convening Authority.

VI.     The evidence with regard to charge I and its sole specification was legally insufficient in that it did not show that Appellant had used cocaine.

VII.    The military judge erred by denying Appellant's motion for additional peremptory challenges based on the Convening Authority's exclusion of court-martial members based on improper selection criteria.

We reject the sixth assignment summarily. We discuss all the others and affirm.

### Summary of facts

Appellant, a Coast Guard captain (O-6) with over twenty-six years of service, tested positive for cocaine upon urinalysis in June 2008. (R. at 795.) Thereafter, with his consent, a sample of his hair was tested by Psychemedics Corporation and tested positive for cocaine. (Prosecution Ex. 1.) Appellant then had the hair of his wife and two daughters tested, and his wife's hair tested positive for cocaine at a high level. (R. at 1310-11, 1713; Defense Ex. O.) One daughter's hair tested positive at a low level, the other daughter's hair tested negative. (R. at 1713; Defense Ex. O.)

## Panel of members

Appellant asserts that he was prejudiced by the improper exclusion of flag officers from service on his court-martial.

Panel selection is reviewed *de novo*. *United States v. Gooch*, 69 M.J. 353, 358 (C.A.A.F. 2011) (citing *United States v. Dowty*, 60 M.J. 163, 171 (C.A.A.F. 2004)). We are bound by the military judge's findings of fact unless they are clearly erroneous. *Id.* An improper motive to "pack" the member pool is not tolerated, and systemic exclusion of otherwise qualified potential members based on rank, race or gender or the like is improper, but good-faith attempts to include all segments of the military community receive deference. *Id.*

The court-martial panel consisted of ten Coast Guard captains (O-6).[1] Testimony from three witnesses describing statements by the Convening Authority and a stipulation of expected testimony of the Convening Authority provide the following thoughts as to why no flag officers (O-7 and above) were included.

First, the Convening Authority, a vice admiral (O-9), was soon to be the Vice Commandant of the Coast Guard. In that capacity, he would be responsible for assigning the other flag officers to billets. He did not want to appoint flag officers to the court-martial whom he would later be assigning to billets.[2] (Deputy SJA, R. at 288, 290; SJA, R. at 293.)

Second, the Convening Authority speculated "that seating a flag officer on a panel might unduly sway other members." (Convening Authority's executive assistant, R. at 300.)

---

[1] A few members were replaced by other captains through amendments. Eight members remained on the panel after challenges.

[2] Presumably this was to avoid having officers on the panel who would seek to please him in advance of future assignment decisions. It should be noted that the initial pool selected by the convening authority in response to the SJA's request dated 29 August 2008 (to whom member questionnaire forms were to be provided for completion) consisted of three flag officers (O-7 & O-8) and seventeen captains. (Appellate Ex. 101 at Attachment 4.) The panel was finalized as General Court-Martial Convening Order No. 1-09 dated 13 January 2009. In the interval between the two dates, the Convening Authority had been selected to serve as the Vice Commandant, according to ALCOAST 555/08, COMDT COGARD R 101929 NOV 08 (Appellate Ex. 105 at Attachment 8).

Third, the Convening Authority wanted to be considerate of flag officers' time demands, and expected availability issues if he appointed any flag officers to the court-martial. (Appellate Ex. 107.)

The military judge found as follows, *inter alia*. The Convening Authority was properly advised of the Article 25 selection criteria several times, including when he picked an initial pool of possible members and when he chose the panel of ten. (R. at 386.) "[T]here was no evidence of an attempt . . . to pack the court with members who would favor the prosecution, a severe sentence or both. The convening authority knew and applied the Article 25 statutory criteria when selecting members" for the convening order for this case. (R. at 388.) These findings are supported by evidence and are not clearly erroneous. Also not clearly erroneous is his finding that "[t]he convening authority's consideration of flag officer availability for court member duties was motivated by a desire to select members who would actually serve on the panel, as opposed to officers who would be detailed and then excused because they were not available." (R. at 391.)

However, the finding that the convening authority "did not categorically exclude all flag officers for consideration" (R. at 392) is inconsistent with his further finding that "his consideration of flag officer availability to actually serve on the court without determining the actual availability of any particular officer resulted in the exclusion of all flag officers" (R. at 392) and is clearly erroneous.

In short, it must be acknowledged that the Convening Authority categorically excluded all flag officers from membership on the court-martial. Hence there was error. *Gooch*, 69 M.J. at 358; *United States v. Kirkland*, 53 M.J. 22 (C.A.A.F. 2000). Where a convening authority intentionally excludes certain classes of individuals, the burden is on the Government to demonstrate lack of harm. *United States v. Bartlett*, 66 M.J. 426, 430 (C.A.A.F. 2008).

We believe the Government has met its burden in this case. As found by the military judge, the Convening Authority was properly advised of the Article 25 selection criteria several times, including when he picked an initial pool of possible members and when he chose a final

panel of ten; there was no evidence of an attempt to pack the court with members who would favor the prosecution, a severe sentence or both; and the convening authority knew and applied the Article 25 statutory criteria when selecting members for this case. *See Gooch*, 69 M.J. at 361. The three considerations that led to the exclusion of flag officers of which there is evidence – the Convening Authority's future assignment responsibilities, the possibility of a flag officer's undue influence on other members, and expected availability issues – are not improper ones, but are benign. *See Bartlett*, 66 M.J. at 431. In contrast to reported cases in which error was found based on rank exclusion, this is not a case of excluding lower-ranking personnel but of excluding higher-ranking personnel. *See United States v. Kirkland*, 53 M.J. 22 (C.A.A.F. 2000); *United States v. Roland*, 50 M.J. 66 (C.A.A.F. 1999); *United States v. Upshaw*, 49 M.J. 111 (C.A.A.F. 1998); *United States v. McClain*, 22 M.J. 124 (C.M.A. 1986); *United States v. Daigle*, 1 M.J. 139 (C.M.A. 1975). Exclusion of lower-ranking personnel invites the suspicion that avoidance of light sentences is intended; this intention was explicit in *McClain*. No such "court-packing" intention or appearance is reasonably to be inferred from exclusion of higher-ranking personnel. Finally, the panel by which Appellant was tried was fair and impartial.[3] *See Gooch*, 69 M.J. at 361.

Appellant contends that the members were all in direct competition with him for selection to flag officer, and thus may have had a motive to decide adversely to him so as to remove a potential rival and incrementally improve their chances for selection to flag rank; and that therefore the Government cannot meet its burden of demonstrating lack of harm. This point was not developed at trial.[4] Whether the members likely or actually saw themselves as being in competition with Appellant is speculative; we do not believe it rises to a level that precludes a finding of no harm. We are convinced that the error in categorically excluding flag officers from the panel was harmless.

Appellant also complains, in Assignment VII, that the Convening Authority excluded potential members from the panel "based on their possible knowledge of Appellant and their

---

[3] The panel deliberated for more than fourteen hours before returning a verdict; that verdict resulted in conviction on the sole specification of wrongful use of cocaine, but acquitted Appellant of the only other specification against him, conduct unbecoming an officer. We also note the relatively benign sentence the members imposed.

[4] What could not have been known at trial but is easily ascertainable now is that all members of the court-martial eventually retired as captains (O-6).

specific billets." (Assignment of Errors and Brief at 46.) One member was removed from the panel by Amendment No. 2 to the Convening Order after identifying himself as "classmate and close friend of the defendant." (Appellate Ex. 105 at Attachment 19; R. at 387 (military judge's findings of fact).) A potential member was not placed on the panel after, as the military judge noted, mentioning her "prior involvement in the case as the commandant's [executive assistant]." (R. at 387.)[5] Two other members were removed from the panel by Amendment No. 1 to the Convening Order after they each indicated that they would be assuming new duties in Chief of Staff positions at the time of or shortly before the trial. (Appellate Ex. 101 at Attachment 8.) Appellant cites *Gooch* for the proposition that exclusion of potential members based on their possible knowledge of an accused is improper, and argues that similarly, a potential member's billet should be regarded as an improper basis for exclusion.

The court in *Gooch* held "that *possible* personal knowledge of the case or the accused, based on contemporaneous service alone, is not a proper basis for screening potential members under Article 25, UCMJ." *Gooch*, 69 M.J. at 360. This does not support the proposition that actual personal knowledge of the case or the accused is not a proper basis for screening. In this case, actual personal knowledge was the basis for excusing the first two officers described in the preceding paragraph. We know of no principle under which this would be considered improper. In the absence of any such principle, and with due regard for Rules for Courts-Martial[6] (R.C.M.) 505(c)(1)(A), which allows the convening authority to change the members of the court-martial before the court-martial is assembled without showing cause, we conclude that it was proper.

Likewise, we see no reason to criticize the Convening Authority's apparent decision to remove two members from the panel because of their new, demanding duties as chiefs of staff without requiring precise information concerning schedule conflicts. The military judge took a broad view of "ongoing relief of military duties" as justification for excusing a member. (R. at

---

[5] The finding of fact misstates her prior role as "involvement"; her court-member questionnaire states that she had "had extensive discussions" with Appellant's apparent supervisor (the person who testified at trial that he received the urinalysis results and informed Appellant he had tested positive (R. at 795-97)) and with the senior assistant trial counsel. (Appellate Ex. 105 at Attachment 19.)

[6] Rules for Courts-Martial, Manual for Courts-Martial, United States (2008 ed.). The provisions of the Manual for Courts-Martial cited in this opinion are identical in the 2008 and 2012 editions.

388.) This was not error. *See Gooch*, 69 M.J. at 358 (availability in the military context is an appropriate screening factor).

There was no error in the Convening Authority's decisions to exclude the specified members from the panel, and thus they provide no basis for granting the defense additional peremptory challenges. Appellant cites no case or other support for the military judge to have granted additional peremptory challenges. The military judge did not abuse his discretion by declining to do so.

**Military Judge's decision not to recuse himself**

Appellant asserts that the military judge was disqualified, and erred by failing to recuse himself. A military judge's decision on the issue of recusal is reversed only for abuse of discretion. *United States v. McIlwain*, 66 M.J. 312, 314 (C.A.A.F. 2008). The issue is viewed objectively. *Id.* Military judges should broadly construe possible reasons for disqualification, but also should not recuse themselves unnecessarily. *Id.*

Before trial, the Government moved for the military judge to recuse himself. (Appellate Ex. 9.) The defense concurred. (Appellate Ex. 10.) The military judge's disclosures on the record during an Article 39(b) session two months before trial revealed the following connections with personnel involved in the case. More than twenty years before the trial, the military judge was stationed in the same location as Appellant, and they were part of a group of junior officers and spouses who socialized together, but the military judge had had no contact of any kind with Appellant or his wife for twenty-one years afterward. (R. at 18-21.) The military judge supervised the individual military defense counsel (IMC) for one year ending seven years before trial, during which they had dinner at each other's home once each, and had had a few professional contacts with each other since then. (R. at 21-22, 32.) The Staff Judge Advocate (SJA) to the Convening Authority was a collateral-duty special court-martial judge, in which capacity the military judge had "managerial oversight" over him, but this collateral duty was ending. (R. at 16, 102.) By its terms, this managerial oversight did not extend to his duties or service as the SJA. The military judge had had recent professional contacts with trial counsel, in relation to a different trial, and the more senior assistant trial counsel, in relation to

administrative duties.[7] (R. at 17-18.) The military judge discussed his relationships with various prospective witnesses, including two officers senior to him, two senior (O-6) judge advocates, Appellant's wife, and a special agent, none of which was noteworthy. (R. at 34-37.)

The military judge also noted that he and Appellant were both eligible for selection for promotion to rear admiral. (R. at 28.) He declared that this would not influence any of his decisions in the case; he also made it clear that, as a judge advocate, he did not view himself as competing with Appellant for promotion. (R. at 28.)

The Government's *voir dire* of the military judge also sought to develop information about his relationships with members of the court-martial. According to the member questionnaires, some of the members were his Academy classmates, and others were Academy upperclassmen with respect to him. (Appellate Exs. 23-42.)[8] Beyond such information that was already available, the military judge declined to detail his contacts with potential members, deeming them irrelevant. (R. at 40.) At that time and on other occasions, he made reference to the possibility that a member might have a problem following the instructions of the military judge. (R. at 40, 44, 105.) This concern apparently arose because on one of the member questionnaires, in response to the question "Is there any reason, such as a prior association with [the military judge], that will keep you from following the military judge's instructions?" the member answered "Yes." (Appellate Ex. 42 at 4.) This followed an affirmative response on the questionnaire to the question of whether he knew the military judge, with the additional information that he was a friend.[9] (Appellate Ex. 42 at 3.)

Although this response (that the member had a reason that would keep him from following the judge's instructions) most likely reflected a misreading of the question, it was obviously taken seriously by all parties, as it must be. The Government developed *voir dire* questions for the judge as a result. As noted, the military judge declined to detail his contacts

---

[7] We consider these contacts with the SJA and both trial counsel as routine contacts with legal professionals that need no further discussion.

[8] At the time of the court session at which the motion was considered, the original convening order was unamended; the court-martial questionnaires were from the originally appointed members.

[9] The prospective court-martial member who submitted this questionnaire was later removed from the court-martial for unrelated reasons. (Amendment No. 1 to General Court-Martial Convening Order No. 1-09.)

with potential members, pointing out that if a member had a problem following the instructions of the judge, this would not be relevant to whether the judge should be disqualified.  (R. at 40.)  Rather, as was implicit in his later remarks, it would be a basis for challenging the member.  (*See* R. at 44, 105.)  After denying the motion to disqualify himself, the military judge offered to seek a military judge from one of the other services "[a]s a matter of convenience" for the Government, to facilitate producing a panel, as well as for any other concerns that might exist.  (R. at 106-07.)[10]  Ultimately, however, no other judge was found who could serve at the scheduled date of trial.  (R. at 267.)

From the military judge's undertaking to seek a replacement military judge, Appellant argues that the judge actually believed himself to be disqualified.  We reject this inference, which is nowhere supported by the military judge's words.  His action in seeking a replacement judge is surely as consistent with his explanation as with Appellant's inference; we see no reason to disregard the military judge's explanation.  Appellant cites *McIlwain*.  In that case the military judge announced that "her participation 'would suggest to an impartial person looking in that I can't be impartial in this case,'" leading inexorably to the conclusion that R.C.M. 902(a) required disqualification.  *McIlwain*, 66 M.J. at 314.  Here, the military judge said no such thing; and we do not believe, viewing the matter objectively, that his continued participation would lead to such a conclusion.

While conceding the absence of actual bias or prejudice, Appellant claims that "the aggregate of the military judge's extensive network of personal and professional relationships" with personnel involved with the court-martial disqualified him.  (Assignment of Errors and Brief at 18.)  Those personnel included "Appellant and multiple counsel, witnesses and members."  (*Id.* at 16.)

A former professional relationship between a military judge or a court member and a witness is not *per se* disqualifying.  *United States v. Wright*, 52 M.J. 136, 141 (C.A.A.F. 1999).  This is surely as true for a military judge with regard to persons other than witnesses.  As Appellant acknowledges, the military judge's professional relationships did not result in actual

---

[10] The military judge had brought up the idea earlier.  (R. at 44.)

bias or prejudice; and we further conclude, viewing the situation objectively, that none of the military judge's professional relationships would cause his impartiality to reasonably be questioned.

A social relationship with a witness, however, "creates special concerns which a professional relationship does not." *Id.* The military judge's social relationships were with Appellant and his wife, both of whom later testified at trial, and with one of Appellant's counsel. The relationship with Appellant and his wife, apparently not deep, was surely attenuated by time. We think the relationship with counsel has no greater significance than the professional relationship of supervisor and subordinate from which it derived. Furthermore, we discern no possible prejudice from any of these social relationships.

Appellant's point that both parties concurred in moving to disqualify the military judge is unpersuasive. Also, we reject the assertion that other actions by the military judge were improper.

The military judge did not abuse his discretion when he declined to recuse himself.

**Rebuttal testimony about cocaine users**

Appellant claims that the military judge abused his discretion by admitting Inspector D's rebuttal testimony over defense objection. A military judge's decision to admit expert testimony is reviewed under an abuse of discretion standard. *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007).

During the defense case, Appellant's wife testified that she had used cocaine during the months preceding Appellant's positive drug test. She testified that she used the cocaine in the home and described her purchases (including how she found a supplier) and use of powder cocaine, the equipment she used to ingest cocaine, and where she stored the equipment, tending to show that cocaine residue could have contaminated areas used by Appellant. In rebuttal, Inspector D, a Senior Inspector for the Contra Costa County District Attorney's Office, was offered and qualified as an expert in street-level narcotics. (R. at 1957.) He testified, based on

his experience as an undercover investigator, concerning the standard process for purchasing powder cocaine, and typical practices for using powder cocaine. (R. at 1959-69.) His descriptions differed in several ways from Appellant's wife's descriptions of her experience and practices.

Appellant complains that Inspector D's testimony was improper human lie detector testimony, as well as improper profile evidence. Human lie detector testimony is "an opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case." *Brooks*, 64 M.J. at 328 (quoting *United States v. Kasper*, 58 M.J. 314, 315 (C.A.A.F. 2003). Inspector D never expressed an opinion as to whether certain testimony was truthful. Indeed, he acknowledged that what he was testifying to "doesn't always have to be that way, but that's the majority of the way it happens." (R. at 1960.) His testimony clearly was not human lie detector testimony. Nor was it the functional equivalent of saying that the witness was untruthful or should not be believed. *See Brooks*, 64 M.J. at 329 (admitting a mathematical statement approaching certainty about the reliability of a victim's testimony was plain error).

Nor was the testimony improper profile evidence. "Profile evidence is evidence that presents a 'characteristic profile' of an offender, . . . and then places the accused's personal characteristics within that profile as proof of guilt." *United States v. Traum*, 60 M.J. 226, 234 (C.A.A.F. 2004). "Generally, use of any characteristic 'profile' as evidence of guilt or innocence in criminal trial is improper." *United States v. Banks*, 36 M.J. 150, 161 (C.M.A. 1992). The "ban on profile evidence exists because this process treads too closely to offering character evidence of an accused in order to prove that the accused acted in conformity with that evidence on a certain occasion and committed the criminal activity in question. This, of course, is prohibited under M.R.E. 404(a)(1)." *Traum*, 60 M.J. at 235 (citing *Banks*, 36 M.J. at 161). "[T]he focus is upon using a profile as evidence of the *accused's* guilt or innocence, and not upon using a characteristic profile to support or attack a witness's or victim's credibility or truthfulness." *Brooks*, 64 M.J. at 329. In other words, as a matter of principle, an accused is not to be convicted because the charged offense would be consistent with his own character or because his characteristics are consistent with typical characteristics of other persons who commit that offense. This principle has nothing to say about a profile applied to a witness.

Appellant's wife testified during the defense case concerning her procurement, storage and consumption of cocaine. Her testimony was central to the defense contention that the accused's positive test results were the product of innocent and unwitting exposure to cocaine in the Sullivan household. Her credibility and the plausibility of her account thus became matters for the members to resolve. To rebut her testimony, the Government called Inspector D to describe prevalent practices among cocaine sellers and users in the Bay Area to provide context within which the Government could argue that aspects of her testimony were improbable. The defense objected, in part by suggesting that members would not benefit from the testimony of a local expert on street level narcotics.[11] The military judge conducted a lengthy Article 39(a) session—which included a full preview of Inspector D's testimony—and heard extensive argument from counsel before determining that Inspector D had specialized knowledge that would be helpful to members charged with determining the facts of the case.[12] (R. at 1864 to 1936,).

The military judge's eventual charge to the members instructed them, "In weighing the evidence, you are expected to use your common sense and your knowledge of human nature. You should consider the inherent probability or improbability of the evidence in light of all the circumstances of the case." (R. at 2007). Notwithstanding the defense contention to the contrary, we do not assume that the procurement, storage, and consumption of cocaine are within the ken of Coast Guard court-martial members simply because they have statutory law enforcement authority. We agree with the military judge's determination that Inspector D's expert testimony would be helpful to the members by providing them some relevant context within which to assess the probability or improbability of aspects of Appellant's wife's testimony. The defense had ample opportunity on cross-examination to underscore Inspector D's acknowledgment that not every cocaine sale or use conformed to the typical case he

---

[11] Counsel argued, "[W]e are dealing here with a jury of eight senior Coast Guard captains. The U.S. Coast Guard, last time I looked, was it itself involved in law enforcement. Every Coast Guard officer . . . has law enforcement responsibilities, powers, at least, if not responsibilities and, at times, actual responsibilities. The notion that you would treat these eight senior Coast Guard captains as if they were the next eight or twelve jurors drawn from the Alameda Country registry of motor vehicles roster or the voter roles [sic] and that they needed to be educated about the use of drugs is, again, preposterous." (R. at 1869).

[12] The military judge restricted Inspector D's testimony in some respects. (R. at 1926-27, 1929-36.)

observed.  Finally, the military judge properly instructed the members on the limitations of expert testimony.[13]

In sum, the rebuttal evidence at issue related to the testimony of the accused's wife, a witness.  The evidence was used to attack her credibility.  By definition, see *Traum*, 60 M.J. at 234, this rebuttal evidence was not the type of evidence subject to the prohibition on the use of profile evidence.  Nor was it human lie detector testimony.  Rather, it was precisely in the nature of testimony from a person with specialized knowledge that was offered to assist the trier of fact to understand other evidence or determine a fact in issue, which is explicitly permissible under M.R.E. 702.  The military judge did not abuse his discretion in allowing the rebuttal testimony.

### Hair test evidence

Appellant contends that the hair test evidence from Psychemedics should have been excluded because the company refused to provide the standard operating procedures (SOP) governing its hair testing.  Appellant also takes issue with some of the military judge's findings of fact on the issue.  A decision on whether to admit or exclude evidence is reviewed for abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008).  Likewise, a ruling on a request for production of evidence is reviewed for abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).  Findings of fact are reviewed for clear error. *United States v. Flores*, 64 M.J. 451, 454 (C.A.A.F. 2007).

The evidence at issue is the testimony of Psychemedics' Dr. C and the exhibits admitted during his testimony, including the Psychemedics laboratory package concerning the test on Appellant's hair.

On 7 May 2009, after the initial Article 39(a) session but before trial, the defense filed a motion headed "Discovery Motion – Warrant of Attachment," seeking a warrant of attachment to enforce a previously-issued subpoena to obtain the SOP used by Psychemedics in testing hair

---

[13] "Only you, the members of the court, determine the credibility of the witnesses and what the facts of the case are. No expert witness or other witness can testify that some other witness's account of what occurred is true or not or credible or not, that the witness, expert or non-expert, believes another witness, or that a charged offense did or did not occur."  (R. at 2009).

samples for evidence of drugs. (Appellate Ex. 70.) Psychemedics moved to quash the subpoena, to which the defense filed a response. (Appellate Exs. 71, 72.) On 22 May 2009, the military judge quashed the subpoena, ordering the Government to withdraw it, but encouraged the defense to narrow its request and seek only portions of the SOP. (Appellate Ex. 73.)

On 28 May 2009, the defense emailed Psychemedics' counsel to pursue a narrower request, identifying several specific items, although not giving up its request for the entire SOP. Psychemedics declined to provide a smaller quantity of material while the larger request remained pending, seeking instead a global resolution. (Appellate Ex. 108.)

On 5 June 2009, the defense filed a new Motion in Limine seeking exclusion of all Psychemedics evidence because of Psychemedics' refusal to provide the requested material. (Appellate Ex. 120.)[14] The Government filed its opposition on 7 June 2009, and the motion was argued at an Article 39(a) session on 8 June 2009. (Appellate Ex. 124; R. at 748-69.) The military judge denied the motion, and provided written findings of fact and a ruling. (R. at 785; Appellate Ex. 323.) Dr. C testified later that day and into the next day, and eventually testified in rebuttal as well.

The Defense expert, Dr. K, was the deputy program manager for forensic toxicology at the United States Army Medical Command. (R. at 1470.) He had previously worked at Psychemedics as the vice president of laboratory operations from 1994 to 1998, after retiring from the Army where he had had duties in forensic toxicology. (R. at 1469-70.) These undisputed facts are included in the military judge's findings of fact. (Appellate Ex. 73 at 2; Appellate Ex. 323 at 2.)

The military judge ultimately concluded that although the defense request for some of the specific materials "would normally appear relevant and necessary . . ., this case presents the somewhat unusual situation where the Defense's expert has extensive knowledge of, and confidence in, the Psychemedics' hair testing process and procedures. In other words, the facts show that the SOP documents are cumulative of [the defense expert's] personal knowledge and

---

[14] Trial on the merits was scheduled to begin, and in fact did begin, on 6 June 2009.

not helpful to the Defense." (Appellate Ex. 323 at 4-5.) Accordingly, he did not exclude the Psychemedics evidence; nor did he order production of the SOP. (Appellate Ex. 323 at 5.)

A party is entitled to evidence that is relevant and necessary. R.C.M. 703(f)(1). Relevant evidence is necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way. R.C.M. 703(f)(1) Discussion.

We agree with the military judge's implicit conclusion that the materials requested were not necessary. The significance of the SOP is its role in ensuring reliability of test results, as Appellant surely agrees. (*See* Assignment of Errors and Brief at 34.) Although Dr. K, the defense expert, cannot be assumed to have known the terms of the current SOP, he knew enough from his knowledge of the prior SOP and his expertise to fully inform the defense's cross-examination of Dr. C, the Psychemedics witness. Based on his advice, the defense could have asked Dr. C whether the laboratory had an SOP, whether it had been followed for Appellant's hair sample, or whether the SOP included particular steps and whether those steps had been followed for Appellant's hair sample. In a slightly different approach, the defense could have asked Dr. C about exactly what steps were performed in testing such as that conducted on Appellant's hair, the training of the personnel who performed steps in the process, the procedures employed to ensure that the steps in the testing were in fact performed as prescribed, the possible consequences if steps were not performed as prescribed, the considerations for each step, how and why the prescribed steps were changed (if they had been changed) over the time Psychemedics had been doing hair testing, as well as every other detail that might be expected to be found in the SOP and, more to the point, every other aspect that might be important to reliability of test results.[15] Thus, the SOP may properly be called cumulative.

Appellant complains that the military judge's findings blame the defense for creating a "time-critical situation." (Assignment of Errors and Brief at 33; *see* Appellate Ex. 323 at 3.)

---

[15] Such questioning, which the military judge actively encouraged but which, apparently, the defense never conducted, could also have been carried out at an Article 39(a) session, or before trial. For example, Psychemedics invited the defense to submit specific questions to it. *See* Appellate Ex. 108; *see also* Appellate Ex. 323 at 2 ("There is no evidence that [Dr. C] has refused to be interviewed by the Defense or discuss testing methods, equipment, quality control, etc. with the Defense expert or counsel.").

This characterization is irrelevant to the military judge's conclusion, and ours, that the requested materials were not necessary. Accordingly, we need not address it.

The military judge did not abuse his discretion in concluding that the Psychemedics SOP was not necessary to be provided to the defense and in admitting the Psychemedics evidence.

### Post-trial advice by witness

Appellant asserts that both the SJA and deputy SJA were disqualified from providing the post-trial advice because they both had testified on a contested matter.

No person who has acted as member, military judge, counsel, or investigating officer in a case may later act as a staff judge advocate upon the same case. Article 6, UCMJ; R.C.M. 1106(b). A staff judge advocate may also be ineligible to provide the post-trial recommendation to a convening authority if he or she has testified as to a contested matter (unless the testimony is clearly uncontroverted), has other than an official interest in the case, or must review that officer's own pretrial action when the sufficiency or correctness of the earlier action has been placed in issue. R.C.M. 1106(b) Discussion. In the absence of a statutory disqualification, "any presumption that a witness cannot later render an impartial evaluation of the case is rebuttable." *United States v. Choice*, 49 C.M.R. 663, 665 (C.M.A. 1975). Even in a case of statutory disqualification, the error is tested for prejudice. *United States v. Stefan*, 69 M.J. 256, 258 (C.A.A.F. 2010). Whether a staff judge advocate or convening authority is disqualified from participating in the post-trial review is a question of law that is reviewed *de novo*. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004).

As discussed above, during the testimony concerning the Convening Authority's selection of panel members (the first issue discussed herein), the SJA and deputy SJA both testified that the Convening Authority expressed that he did not want to appoint flag officers to the court-martial whom he would later be assigning to billets. The deputy SJA signed, as acting SJA, the Staff Judge Advocate's Recommendation (SJAR) dated 24 September 2009. In the post-trial submission under R.C.M. 1105 dated 29 October 2009, the defense requested that the SJA and deputy SJA be disqualified because they had testified as to a contested matter, and

requested a rehearing due to asserted legal errors, one of which was the categorical exclusion of flag officers from the panel.

R.C.M. 1106(d)(4) requires the SJA to provide an opinion to the convening authority concerning any allegation of legal error in matters submitted under R.C.M. 1105. In compliance therewith, the Addendum to the SJAR dated 2 November 2009, signed by the SJA, advises that the alleged legal errors "are without merit and do not require corrective action on the findings or sentence." The Addendum also notes the argument that the deputy SJA and SJA were disqualified and the consequent request for assignment of a substitute SJA for the purpose of post-trial advice, and demurs, advising, "Our limited testimonial activity on a procedural pretrial motion in this case is not a basis for disqualification."[16]

In conformity with the SJA's advice, the Convening Authority did not act on the defense requests for disqualification of the SJA and deputy SJA and for a rehearing.

We conclude that neither the SJA, nor the DSJA acting in his stead, was disqualified from participating in the post-trial review in this case. Bearing in mind the R.C.M. 1106(b) Discussion, we are inclined to say the testimony given by the SJA and deputy SJA was uncontroverted. Although there was other evidence of the Convening Authority's thinking, none of it was contradictory to or inconsistent with their testimony. Further, as we see it, the testimony of the SJA and deputy SJA was the strongest evidence in favor of the defense showing that exclusion of flag officers from the panel was categorical and arguably improper. This means that neither of them, in reviewing the issue, would be personally invested in defending their credibility against the interest of Appellant, but would have only an unbiased and official interest. Accordingly, we reject the notion that they could not render impartial advice in the matter. *See Choice*, 49 C.M.R. at 665-66. The SJA and deputy SJA were not disqualified to provide post-trial advice.

---

[16] By this time, the original Convening Authority had departed and a new Convening Authority was in place. (*See* General Court-Martial Order No. 1-10; compare General Court-Martial Convening Order No. 1-09 and both amendments thereto.)

### Decision

We have reviewed the record in accordance with Article 69, UCMJ. Upon such review, the findings and sentence are determined to be correct in law. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Judges NORRIS and GILL concur.



For the Court,

L. I. McClelland
Chief Judge