# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**THE COURT EN BANC[1]**

**UNITED STATES OF AMERICA**

**v.**

**JASON T. TUCKER**
**STAFF SERGEANT (E-6), U.S. MARINE CORPS**

**NMCCA 201400135**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 15 March 2013.
**Military Judge:** Col G.W. Riggs, USMC.
**Convening Authority:** Commanding General, 2d Marine Division, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Maj J.N. Nelson, USMC.
**For Appellant:** LT Jessica Ford, JAGC, USN; LT Jacqueline Leonard, JAGC, USN.
**For Appellee:** LT James Belforti, JAGC, USN.

**25 August 2015**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

FISCHER, Senior Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of five specifications of selling military property of a value greater than $500.00 and five specifications of stealing military property of a value greater than $500.00 in violation of

---
[1] Judge KING and Judge PALMER did not participate in the decision of this case.

Articles 108 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 908 and 921.  The members sentenced the appellant to reduction to pay grade E-1, a $7,900.00 fine, confinement for twelve months (if the fine was unpaid), a reprimand, and a bad-conduct discharge.  In his action the convening authority (CA) excepted the number "4" and substituted the number "2" in front of the words "Enhanced Small Arms Protective Inserts" (E-SAPI plates) in Specification 4 of Charge II.[2]  As a matter of corrective action and clemency, the CA approved only so much of the sentence as provided for a bad-conduct discharge, a fine of $5,000.00, and confinement in excess of eight months if the fine was unpaid.[3]

The appellant raises nine assignments of error (AOE) and we specified an additional AOE.[4]  After reviewing the record of

---

[2] See footnote 15.

[3] The appellant paid the fine and, thus, served no confinement.

[4] The appellant raises the following AOEs:

I.  Is the evidence factually and legally sufficient to sustain the appellant's convictions?

II.  Was it an abuse of discretion to find the military judge was not disqualified due to an appearance of bias at trial?

III.  Did the military judge err in admitting Prosecution Exhibits 1 through 36 into evidence?

IV.  Was it reversible error for the military judge to permit the trial counsel to cross-examine defense character witnesses with questions about the charges the appellant was facing?

V.  Did the military judge plainly err in allowing a witness to provide hearsay testimony in the form of an inquiry into an unknown database?

VI.  Should we remand for a sentence rehearing when the CA disapproved findings that the appellant stole E-SAPI plates issued to Cpl F and Cpl F was the lone government witness in presentencing?

VII.  Should the cumulative error doctrine apply to this case?

VIII.  Did the Staff Judge Advocate (SJA) err in failing to advise the CA on a duty to reassess the appellant's sentence and in failing to serve a new matter on the trial defense counsel?

IX.  Did the CA violate the appellant's right to a speedy post-trial review when the CA's action was completed 212 days after the trial was completed?

2

trial, the pleadings of the parties and their responses to the specified issue, we find partial merit in the appellant's first AOE contesting the factual sufficiency of his larceny convictions. After taking corrective action in our decretal paragraph and reassessing the sentence, we conclude that the remaining findings and the reassessed sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ.

## Background

From October 2010 through March 2012, the Naval Criminal Investigative Service's (NCIS) Special Operations Unit conducted an undercover operation, referred to as "Operation Sweet Tea." The objective of this operation was "to slow down the theft and sale of military property, specifically Marine Corps property coming off of Camp Lejeune,"[5] and address "serious problems with the accountability and inventory of items that were issued by the Marine Corps."[6] NCIS agents went undercover posing as potential buyers for military-type property presumably stolen from the Marine Corps. These transactions often began with a seller posting an online advertisement for military-type property and an NCIS agent responding to the advertisement. The agent would then attempt to set up a meeting with the seller to make a controlled purchase of the items offered for sale.

The first transaction involving the appellant was arranged after the appellant placed an advertisement for such items on a local internet auction site. A total of five such transactions occurred on 29 December 2010, 5 January 2011, 14 January 2011, 10 February 2011 and 1 April 2011. NCIS purchased the following for a total of $7,900.00: 17 E-SAPI plates of varying sizes; 1 Modular Tactical Vest (MTV); 3 plate carriers; 2 pairs of Night Vision Goggles (NVGs); 1 Surefire flashlight kit and 1 Surefire

---

Specified Issue: Whether the evidence adduced at trial supports a conviction for each of the five larceny specifications notwithstanding the Government alleging that each larceny was committed "on an unknown date?"

We address AOEs I, II and IX and find the remaining AOEs to be without merit. *United States v. Clifton*, 35 M.J. 79, 81-82 (C.M.A. 1992). The specified issue is mooted by our remedial action.

[5] Record at 131.

[6] *Id.* at 174.

flashlight.[7]  At least 16 of the original 25 items bore at least one of the following identifying marks: legible serial numbers; legible National Stock Numbers (NSN)[8]; or a contract number.[9]

At trial, the Government's evidence centered on the testimony of NCIS Special Agent (SA) D and two Marines who had been issued three of the traceable, serialized E-SAPI plates sold to NCIS on 14 January 2011, along with the testimony of Defense Logistics Agency (DLA) Supervisory Special Agent (SSA) G.  Additionally, the Government introduced video recordings of the controlled purchases, the final four of which contained audio.

SA D testified that two of the three E-SAPI plates with identifiable serial numbers were traced back to a Marine from the appellant's unit, 2d Light Armored Reconnaissance Battalion (2d LAR), Corporal (Cpl) R.[10]  Cpl R testified that his E-SAPI plates[11] went missing "somewhere around February 2010 to February 2011" from the "NCO office."[12]  He could not specifically recall in what month this occurred.  Cpl R testified that he completed a missing gear statement shortly after the property went missing, however this document was not introduced at trial.

The other serialized E-SAPI plate was traced back to another 2d LAR Marine, Cpl F.[13]  Cpl F testified that his gear went missing from his wall locker when it was broken into around 9 February 2011.[14]  Yet, the evidence suggests that Cpl F's E-

---

[7] We note that NCIS purchased a Surefire flashlight, but the appellant is charged with selling a "Surefire flashlight kit" under Charge I, Specification 4.

[8] An NSN is used to identify a type or particular brand of item purchased by the U.S. Government and maintained in the Government's supply chain.

[9] Some of the photos in the record are of such poor quality that identifying information could not be discerned.  With other items, the serial number was unreadable because it had had worn off or was marked up in such a way as to obscure the number.

[10] PE 13, 16; Record at 170-71.

[11] Cpl R testified that other items besides the E-SAPI plates also went missing, to include "my flak and Kevlar and all the magazine pouches, grenade pouch, IFAC, dump pouch."  Record at 240.

[12] Id.

[13] PE 15; PE 38; Record at 171.

[14] Record at 251; PE 38.

4

SAPI plate was among the items sold to NCIS on 14 January 2011 – one month prior to when Cpl F testified the item was taken from his locker.[15]

While none of the remaining items charged were directly linked to the U.S. military or a U.S. service member, the prosecution offered the testimony of a SSA G and a printout from WebFLIS[16], a DLA database, to prove the items recovered with an NSN number were "military property" because such items were maintained as "property of the Department of Defense" (DoD) and under "Government control."[17]

SSA G further testified that the same recovered items were assigned a Code D designation which requires that the item be demilitarized prior to disposal.[18]  According to SSA G, this means that such items "[b]y regulation [are] forbidden from leaving government control intact and usable."[19]  On cross-examination however, SSA G admitted that NSN-linked items have left Government control through legitimate transfer mechanisms and sometimes for unexplained reasons.[20]

During the course of the transactions, the appellant made multiple comments to the undercover agents indicating that he obtained some of the equipment he was selling from sources within the Marine Corps.

The appellant testified in his own defense at trial and maintained that he acquired all of the items he sold through an online resale site, at local flea markets, or from other

---

[15] PE 15.  In a post-trial claim of legal error, the appellant's trial defense counsel argued impossibility as it related to the appellant's alleged theft of Cpl F's E-SAPI plates.  Based on this, the staff judge advocate recommended that the CA except the number "4" and substitute the number "2" from Specification 4 of Additional Charge II to reflect that the CA approved a finding of the appellant's larceny of 2 vice 4 E-SAPI plates alleged in this specification.  The CA's action followed this recommendation and therefore we conclude the CA disapproved the appellant's conviction for larceny of the E-SAPI plates issued to Cpl F.

[16] PE 39.

[17] Record at 211, 220-22.

[18] *Id*. at 219; 222.

[19] *Id*. at 221.

[20] *Id*. at 221-23.

Marines. The appellant specifically testified that he received the first pair of NVGs he sold from Gunnery Sergeant A in 2008 and that those type of NVGs had not been issued in the Marine Corps since 2003. The appellant also testified to working with Sergeant (Sgt) C to acquire and sell property. The appellant stated that Sgt C similarly acquired tactical gear from the same online resale site the appellant frequented and when the appellant found a buyer for this equipment, Sgt C would provide the appellant with gear to sell and they would share the profit. The appellant denied stealing any of the items he sold and testified that he "never thought it was stolen it was just, you know, old DRMO[21] stuff that was either excess or no one had a need for anymore."[22]

Additional facts necessary for the resolution of particular assignments of error are included below.

## Factual Sufficiency

We review issues of factual sufficiency *de novo*. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our factual sufficiency determination is limited to a review of the "entire record," meaning evidence presented at trial. *United States v. Bethea*, 46 C.M.R. 223, 225 (C.M.A. 1973); *see also United States v. Reed*, 54 M.J. 37, 44 (C.A.A.F. 2000).

---

[21] DRMO refers to a DLA program to dispose of excess property from the military services. DLA Disposition Services manages the DoD surplus property sales program. Excess property that is not reutilized, transferred, or donated may be sold to the public. The property, no longer needed by the Government, is only to be sold if it is appropriate and safe for sale to the general public.

[22] Record at 278.

**Larceny**

"When it is established that the accused is in conscious, exclusive, and unexplained possession of recently-stolen property under such circumstances that innocent possession is reasonably ruled out," the factfinder is permitted to infer that such possession "could have been acquired only by the possessor's theft of that property." *United States v. Pasha,* 24 M.J. 87, 90 (C.M.A. 1987) (quoting *Pendergrast v. United States,* 416 F.2d 776, 787 (D.C. Cir. 1969). The Government essentially staked their larceny case on this permissible inference, arguing in closing "[t]here was a taking of the property ... because the U.S. Government, who owns the property, no longer had the property. It was in the control and custody of the accused."[23]

In conducting our review pursuant to Article 66(c), UCMJ, and making allowances for not having seen or heard the witnesses, we simply find factually insufficient evidence to infer that the appellant's possession of the property necessarily resulted from his theft. Even setting aside the appellant's contention that he acquired the property through lawful means, the Government produced only minimal evidence that any of the property items were "recently" stolen or missing. The notable exception being the E-SAPI plates originally issued to Cpl R. However, Cpl R's testimony was no more specific than that his E-SAPI plates went missing from the NCO office sometime between February 2010 and February 2011 and that he filed a missing gear statement.[24] The Government's paucity of evidence as to when and how the appellant acquired possession of the items is highlighted by specifications that allege the appellant committed the larcenies "at an unknown location, on an unknown date." The appellant sold items commonly used by the military and issued to Marines. The Government essentially argued that since such items were not supposed to leave DoD control and the appellant possessed them, he therefore must have stolen the items. Considering the record before us, we find this argument unpersuasive and are not convinced of the appellant's guilt

---

[23] *Id.* at 395.

[24] Cpl R's missing gear statement was not offered at trial however, a missing gear statement from Cpl R was included in the appellant's post-trial submissions to the CA. The statement indicates that Cpl R, along with twelve other Marines, was directed to give up his MTV (including E-SAPI plates) to the Afghanistan National Border Patrol and the 2d LAR Unit Interpreters prior to redeploying from Afghanistan in 2009. As we are limited to the evidence presented at trial in conducting our Article 66(c) review of the court-martial findings, (*see Beatty*, 64 M.J. at 458 n.4), we have not considered the appellant's post trial submissions in our factual sufficiency review.

beyond a reasonable doubt as to any of the five specifications under Charge II.

**Wrongful Sale of Military Property**

The appellant also avers that the Government presented insufficient evidence to prove that the items the appellant sold to the NCIS undercover agents were "military property" at the time the transactions were completed. Under Article 108, "[m]ilitary property is all property, real or personal, owned, held, or used by one of the armed forces of the United States. . . . It is immaterial whether the property sold . . . had been issued to the accused, to someone else, or even issued at all." MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 32c(1). "In a general sense, all property purchased with federal funds and owned or held by a service is military property." *United States v. Simonds*, 20 M.J. 279, 280 (C.M.A. 1985) (holding merchandise from a ship's store was military property) (citation omitted); *cf. United States v. Schelin*, 15 M.J. 218, 220 (C.M.A. 1983) (holding retail merchandise of the Army and Air Force Exchange Service was not "military property of the United States").

The Government relied upon the following circumstantial evidence to prove the items were military property: (1) statements the appellant made to the undercover agents during the sale transactions; (2) identifying markings on the property; (3) the appearance and tactical nature of the property; (4) testimony from SA G about the proper demilitarization of such property; (5) several items with scratched over serial numbers rendering them unreadable; and (6) three of the E-SAPI plates with legible serial numbers that were traced to items issued to Cpl R and Cpl F. With the exception of the flashlight kit[25] and flashlight[26], we are convinced beyond a reasonable doubt that the items the appellant sold to undercover NCIS Agents on five separate occasions between December 2010 and April 2011 were military property.[27]

---

[25] Prosecution Exhibit 18.

[26] PE 24.

[27] PEs 18 and 24 display no visible markings indicating the items are U.S. Government property. The Government presented no evidence to establish the items as tactical military equipment. SSA G did not testify regarding the flashlight kit or flashlight and they were not listed on the Webflis document entered into evidence. After selling a flashlight kit to SA D on 14 January 2011, the appellant told him "I don't know anything about Surefires, but if you're saying it's CTEP, I'm pretty sure we can get it." Record at 152. SA D

8

<u>NVGs, Plate Carriers and Modular Tactical Vest, and E-SAPI
plates</u>

The appellant sold a single pair of NVGs[28] at each of the controlled buys on 5 January and 10 February. During the first transaction the appellant, referring to the NVGs, told SA D, "[p]retty much it is refurbished, I mean, we go get like aftermarket parts to repair on deployment. So we piece them together so it is not like a serialized piece of gear. So we will stockpile and like some of the base units. Once we get enough to make an extra one, you know, we will make an extra one."[29] The appellant then later told SA D during the same transaction, "I mean. It's kind of stupid to say, but I'm always worried about selling some of this stuff to, you know, shady people, you know dirtbags. . . ."[30]

The three serialized E-SAPI plates admitted into evidence were issued to Marines belonging to the appellant's unit. All but one of the E-SAPI plates introduced were marked "U.S." and eight of them looked virtually identical to the serialized plates, with the exception that the serial numbers on those eight were obscured. The remaining six looked similar, but were smaller side E-SAPI that lacked serial numbers. SSA G testified that all of this equipment, to include the MTV and plate carriers, was listed in WebFLIS and carried a demilitarization code "D", meaning the items were prohibited from leaving Government control intact and usable. On their face, the items are clearly tactical gear of the type and character issued to military personnel, a fact recognized by the appellant when he expressed reservations about selling the equipment to the wrong sort of people.

The appellant alleges the Government presented insufficient evidence to prove that the items were military property because they were, by and large, not traced back to the Marine Corps

---

testified that CTEP "is another gear warehouse for the Marine Corps such as CIF, the Consolidated Issuance Facility." *Id.* On 10 Feb 2011, the appellant sold a flashlight to SA D. We do not find the appellant's statement concerning "Surefires" sufficient to prove the flashlight kit and flashlight he sold were military property. In short, we are not convinced that the Government proved the flashlight kit and flashlight entered into evidence were military property at the time the appellant sold the items.

[28] PE 9 and PE 22.

[29] Record at 140-141.

[30] *Id.* at 142.

and, despite the items having a demilitarization code "D", SSA G conceded that such items have left military control through illegal means or by mistake in the past.  The members clearly rejected the appellant's contention at trial and found that the items were military property and the appellant knowingly and wrongfully sold the items.  We agree with respect to all the items, excepting PE 18 and PE 24, and are convinced beyond a reasonable doubt of the appellant's guilt to the specifications under Charge I.

## Judicial Bias

Approximately five weeks following adjournment of the appellant's court-martial, the trial defense team filed a docketing motion requesting a post-trial Article 39(a), UCMJ, session to address the military judge at the appellant's court-martial, Colonel (Col) Riggs, continued participation in the case.[31]  This defense request was prompted by Col Riggs self-recusal in a separate case based in part on interactions between Col Riggs and the military defense counsel, who also represented the appellant.[32]  After receiving a court response to their docketing motion, the defense team filed a motion for Col Riggs to recuse himself from further participation in the appellant's case.[33]

Col D. J. Daugherty, then-Chief Judge of the Navy-Marine Corps Trial Judiciary, detailed himself to conduct a post-trial hearing on the appellant's motion.  Following that hearing, during which Col Riggs testified, Col Daugherty ruled that "in the interests of justice and in order to enable the full and free exercise of the post-trial due process rights of the accused, this case must be transferred to a new judge for any post trial judicial matters."[34]  Col Daugherty also ruled, "[t]hat the defense has failed to establish a reasonable factual basis for disqualification of Col Riggs during the trial phase of this case."[35]  The defense then filed a motion on 28 June 2013 to set-aside the findings due to the disqualification of Col Riggs or, in the alternative, for a mistrial under RULE FOR COURTS-

---

[31] Appellate Exhibit L.

[32] The hearing in the separate case took place three weeks after the appellant's court-martial adjourned.

[33] AE LIV.

[34] AE LXIII at 12.

[35] *Id.*

MARTIAL 915, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).[36] Following another post-trial Article 39(a) session, Col Daugherty denied the defense motion in a written ruling wherein he stated:

> Based on a complete reading of the verbatim record of trial, an analysis of both the number of objections, the rulings, the language used in his rulings and the tact Judge Riggs took with both trial and military defense counsel and his tact with Mr. Beal, and upon reflection of each of the defense allegations and the testimony of Judge Riggs, the court finds beyond a reasonable doubt that in the context of the entire trial, a reasonable man knowing all the facts and circumstances would not doubt the legality, the fairness and the impartiality of Judge Riggs during the court-martial.[37]

In this assignment of error, the appellant reiterates his post-trial challenge to set aside the findings due to the disqualification of Col Riggs to preside at his court-martial. We find that Col Daugherty did not abuse his discretion in denying the defense motion.

"'An accused has a constitutional right to an impartial judge.'" *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quoting *United States v. Wright,* 52 M.J. 136, 140 (C.A.A.F. 1999)) (additional citations omitted). R.C.M. 902(a), provides that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." The decision of a military judge on the issue of recusal is reviewed on appeal for abuse of discretion. *United States v. Norfleet*, 53 M.J. 262, 270 (C.A.A.F. 2000). In reviewing a military judge's ruling on a recusal motion, we consider the facts and circumstances under an objective standard. *Butcher*, 56 M.J. at 91. The test is whether there was "'[a]ny conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned . . . ." *Id*. (quoting *United States v. Kincheloe*, 14 M.J. 40, 50 (C.M.A. 1982)) (additional citation and internal quotation marks omitted).

---

[36] AE LXIV.

[37] AE LXXI at 14.

The appellant now alleges Col Daugherty abused his discretion in the following three ways: (1) he misapplied the law in stating, "a reasonable man would see that Judge Riggs was not the finder of fact or the determiner of the sentence in this case"[38] because a military judge disqualified to sit in a judge alone trial is equally disqualified to preside over a members trial; (2) his ruling omitted an exchange where the military judge responded to an objection by the assistant trial counsel that the military defense counsel "is testifying" by stating, "and arguing with the witness, so sustained"; and (3) his ruling was overly reliant on the failure of the trial defense team to challenge the military judge or object further to his actions during the course of the trial.[39]

Col Daugherty's reference to the military judge not being the fact finder or sentencing authority in the appellant's court martial was part of a seven-page "analysis and discussion" section in his written ruling and was one of many factors he cited in evaluating the overall appearance of fairness of the appellant's court-martial. We do not interpret the statement as a finding that Col Riggs would have been disqualified from presiding over a judge-alone trial or espousing law contrary to *Sherrod*. We do not find it to be a central factor in Col Daugherty's ruling and even if we had found that he erred in making the reference we would also find it to be harmless error.

In his written ruling, Col Daugherty cited to multiple occasions in the record where Col Riggs engaged in semi-contentious exchanges with counsel for both sides, in front of members and also outside their presence. Though Col Daugherty did not endorse the judicial temperament Col Riggs displayed during the trial[40] he ultimately concluded Col Riggs interactions with counsel did not reflect an abandonment of his impartial judicial role. We agree and note that "remarks, comments, or

---

[38] Appellant's Brief of 2 Jun 2014 at 23 (citing *United States v. Sherrod*, 26 M.J. 30, 33 (C.M.A. 1988)).

[39] We find this contention unpersuasive as the "[f]ailure of the defense to challenge the impartiality of a military judge may permit an inference that the defense believed the military judge remained impartial." *United States v. Burton,* 52 M.J. 223, 226 (C.A.A.F. 2000) (citation omitted).

[40] Col Daughtery stated, "[t]his ruling should not be taken as a tacit endorsement of Judge Riggs' deportment, conduct or comments to counsel. Judge Riggs could have done better in his deportment, he could have been milder or more courteous with all the counsel and he could have taken greater care to ensure that all his comments and actions appeared just at all times." AE LXXI at 14.

12

rulings of a judge do not constitute bias or partiality, 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

In considering the facts before us, including Col Daugherty's precautionary action to replace Col Riggs post-trial, we find that no reasonable observer, fully cognizant of the pertinent facts, would conclude that this appellant did not receive a fair trial from an impartial judge.

## Post-Trial Delay

Whether an appellant has been deprived of his due process right to a speedy appellate review is a question of law we review *de novo*. When such delays occur, claims of due process violations caused by the delay are reviewed under the four-part test laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). In such analysis, we balance the (1) length of delay; (2) reasons for the delay; (3) appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Id*. No one factor is determinative and the court will decide whether each factor favors the Government or the appellant. *Id.* at 136.

A due process analysis of post-trial delay begins with a determination whether the delay in question is facially unreasonable. *Id*. at 135-36. If the period between completion of the trial and the CA's final action is greater than 120 days, it is presumed to be a facially unreasonable delay. *Id*. at 142. The length of delay between the completion of the court-martial on 8 August 2013 and the CA's Action on 20 March 2014 totaled 212 days. As such, the delay in this case is unreasonable on its face, triggering a full *Barker/Moreno* analysis. *See id*.

The presumption of unreasonableness can be overcome by a showing of legitimate, case-specific circumstances. *Id.* at 142-43; *see also United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F 2011). Here, the staff judge advocate (SJA) completed his recommendation (SJAR) on 4 November 2013 and eleven days later the appellant's detailed defense counsel submitted a 122-page response alleging thirteen legal errors. The SJA provided a detailed addendum to his original SJAR on 20 January 2014, addressing the appellant's allegations of legal error. The detailed counsel responded on 29 January 2014 by alleging additional legal errors. The SJA then issued a second addendum on 7 March 2014, in which he recommended the CA disapprove a

13

portion of the findings,[41] reduce the adjudged fine by $1003.59 to account for the partial disapproval of the findings, and further reduce the fine by $1896.42 as a matter of clemency to account for the post-trial delay. Eleven days later, detailed counsel again responded by alleging numerous legal errors, stating the recommended clemency was inadequate and maintaining that a sentencing rehearing was required. The CA acted on 20 March 2014 and explained that post-trial processing delay resulted from the lengthy record of trial, the time required for his SJA to carefully review the record and address the multiple submissions from the appellant alleging legal error and requesting clemency, base closings due to inclement weather and numerous federal holidays. Here we find the extensive post-trial review was the primary factor that caused the delay.

Next, this court looks at whether the appellant objected to the delay or asserted his right to timely review. *See Arriaga*, 70 M.J. at 57. In the detailed counsel's 29 January 2014 response to the first addendum to the SJAR, he complains of post-trial delay.

When analyzing the fourth factor, prejudice, the court should consider three interests in a prompt appeal: (1) prevention of oppressive incarceration; (2) minimization of anxiety and concern of those awaiting the outcome of their appeals; and, (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired by the delay. *Moreno*, 63 M.J. at 138-41. The appellant was adjudged contingent confinement, which he did not serve. For the second sub-factor, the appellant must demonstrate he suffered a "'particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision.'" *Arriaga*, 70 M.J. at 58 (quoting *Moreno*, 63 M.J. at 140). Here, assuming the appellant's general complaint of anxiety about waiting for the check to be cashed to pay his fine meets the "particularized" requirement, we find this was ameliorated by the CA's reduction of the appellant's fine amount. Finally, in light of our remedial action, we find no prejudice on the third sub-factor addressing retrial.

Considering the facts before us, we find the financial relief the CA provided the appellant in the form of approving a reduced fine amount satisfied any violation caused by post-trial delay.

---

[41] *See* Footnote 15.

## Sentence Reassessment

Because of our action on the findings, we will reassess the sentence in accordance with the principles set forth in *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006), *United States v. Cook*, 48 M.J. 434, 438, (C.A.A.F. 1998), and *United States v. Sales*, 22 M.J. 305, 307-09 (C.M.A. 1986). Although a "'dramatic change in the penalty landscape' gravitates away from the ability to reassess" a sentence, *United States v. Buber*, 62 M.J. 476, 479 (C.A.A.F. 2006) (quoting *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003)), we ultimately find no such change here.

While our decision reduces the maximum possible punishment from confinement for 100 years to confinement for 50 years, both punishments are so far removed from the approved sentence as to render the difference legally insignificant. More importantly, nothing in our decision changes the evidence properly in the record for sentence determination. We specifically find that Cpl F's testimony concerning the negative financial impact caused by his missing E-SAPI plate would have been equally admissible since the appellant remains convicted of knowingly and wrongfully selling that military property. Finally, the facts adduced on the affirmed charge and specifications provide ample justification for the approved sentence.

## Conclusion

The findings of guilty to Charge II and all specifications thereunder are set aside and Charge II and its specifications are dismissed with prejudice. Additionally, we except the words "a M962 Surefire Flashlight kit" from Specifications 3 and 4 under Charge I. We affirm the remaining findings, as excepted, and the sentence as approved by the CA.

For the Court

R.H. TROIDL
Clerk of Court

15